**Pearl DAVIS, Executrix of the Estate of Raymond E. Davis, Deceased, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 86–1244.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1986.

Decided July 6, 1987.

As Amended July 16, 1987.

---

8. We of course express no opinion on or in any way predict the results the Board will reach on remand.

William J. Harte, Chicago, Ill., for plaintiff-appellant.

Anton R. Valukas, U.S. Atty., Chicago, Ill., David V. Hutchinson, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before BAUER, Circuit Judge, WOOD, Circuit Judge, and CAMPBELL, Senior District Judge.[*]

WILLIAM J. CAMPBELL, Senior District Judge.

On the morning of October 25, 1978, Raymond Davis (Davis), the husband of plaintiff-appellant Pearl Davis (Pearl), departed in his Piper Comanche airplane from an airport in Dixon, Illinois. The airplane crashed and Davis was killed. There were deteriorating weather conditions in Dixon and the surrounding area that morning. The primary issue in this case, brought by plaintiff Pearl in her capacity as executrix of the estate of her deceased husband under the Federal Tort Claims Act (28 U.S.C. § 2671 *et seq.*), is whether Federal Aviation Administration (FAA) officials were negligent by inadequately briefing Davis about the unsettled weather conditions. After a bench trial the district court held that the FAA officials had breached no duty to Davis. Pearl appeals, 643 F.Supp. 67. We affirm.

We first address the controlling legal principles in this case. *Spaulding v. United States*, 455 F.2d 222 (9th Cir.1972) has become an influential, oft-cited case in the area of airplane tort cases. The language from *Spaulding* is very instructive for our purposes in establishing the duty of care FAA officials owe to pilots such as Raymond Davis:

> While general negligence law applies to airplane tort cases, ... the standard of due care is concurrent, resting upon both the airplane pilot and ground aviation personnel. Both are responsible for the safe conduct of the aircraft.... The pilot is in command of his aircraft. He is directly responsible and has final authority for its operation. See 14 C.F.R. § 91.3(a). However, before the pilot is held legally responsible for his aircraft, he must know those facts which are material to the operation of his plane.
>
> An important source of this information is tower personnel, air traffic controllers, and service station personnel. The air traffic controller is required to give all information and warnings specified in his manuals, and in certain situations he must give warnings beyond the manuals. (When danger is immediate, extreme, or known only to federal personnel; when the controller is better qualified than the pilot to evaluate a given situation or make more accurate observations than the pilot). This duty to warn is based on the simple tort principle that once the Government has assumed a

---

[*] The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

function or service, it is liable for negligent performance.

The controller's duty to warn does not, however, relieve the pilot of his primary duty and responsibility. The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes and instruments.... A pilot cannot ignore the weather information he has been given or disregard the weather conditions he sees around him.

Within this legal context, appellants argue that the federal employees in the "air traffic control service [have] a continuing duty not only to communicate weather information ... but have a continuing duty both to restrain a pilot from taking off into a hazardous weather condition" and ... to urge the pilot not to take off ... before ... the flight. These personnel had no duty to quiz the pilot on his qualifications and flight plan, or to offer a gratuitous opinion that he should delay his flight. In situations where judgment is exercisable, the "judgment as to whether and when weather conditions permit take-off is for the pilot ..." (footnotes and citations omitted) (parenthesis added).

455 F.2d at 226–27.

We also note the following passage from *Redhead v. United States*, 686 F.2d 178, 182 (3rd Cir.1982), "The pilot is in command of the aircraft ... [and] must be aware of those facts which are material to its proper operation and is charged with that which he should have known in the exercise of the highest degree of care." (See also *American Airlines, Inc. v. United States*, 418 F.2d 180 (5th Cir.1969)).

We note Raymond Davis was a VFRs-certified pilot, certified to fly a private airplane only under visual flight rules, i.e. "see and avoid" type of weather conditions. An explanation of these conditions can be found at 14 C.F.R. § 91.105(a).[1] Generally, a VFRs pilot cannot fly if the cloud ceiling is less than 1,000 feet from the earth's surface. Broken clouds, if obscuring, fall within the definition of ceiling (14 C.F.R. § 1.1) but thin or partial clouds do not. Visibility must be at least three miles. A VFRs pilot is to be contrasted with an Instrument Flight Rule (IFR) pilot who, unlike the VFRs pilot, can fly among clouds and guide the aircraft by referring to instrumentation rather than eyesight.

Finally, in a claim as this one under the Federal Tort Claims Act, the law of the state where the action arose applies. 28 U.S.C. § 1346(b). It is undisputed that this action arose in Illinois. At the time of the crash of Davis' airplane, the common law doctrine of contributory negligence was the law in Illinois. During the time period when this trial was held, Illinois had adopted, via *Alvis v. Ribar*, 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886 (1981), the

---

1. 14 C.F.R. § 91.105(a) reads:

§ 91.105 Basic VFR weather minimums.

(a) Except as provided in § 91.107, no person may operate an aircraft under VFR when the flight visibility is less, or at a distance from clouds that is less, than that prescribed for the corresponding altitude in the following table:

| Altitude | Flight visibility | Distance from clouds |
|---|---|---|
| 1,200 feet or less above the surface (regardless of MSL altitude)— | | |
| Within controlled airspace | 3 statute miles | 500 feet below. 1,000 feet above. 2,000 feet horizontal. |
| Outside controlled airspace | 1 statute mile except as provided | Clear of clouds. |

in § 91.105(b).

| | | |
|---|---|---|
| More than 1,200 feet above the surface but less than 10,000 feet MSL— | | |
| Within controlled airspace | 3 statute miles | 500 feet below. 1,000 feet above. 2,000 feet horizontal. |
| Outside controlled airspace | 1 statute mile | 500 feet below. 1,000 feet above. 2,000 feet horizontal. |
| More than 1,200 feet above the surface and at or above 10,000 feet MSL— | 5 statute miles | 1,000, feet below. 1,000 feet above. 1 mile horizontal. |

"pure" form of comparative negligence stating it to be, "... the only system which truly apportions damages according to the relative fault of the parties and, thus, achieves total justice ... the plaintiff's damages are simply reduced by the percentage of fault attributed to him ... the 10% negligent defendant will be made to bear 10% of his own damages as well as 10% of plaintiff's." *Id.* 52 Ill.Dec. at 34–35, 421 N.E.2d at 897–98. In *Alvis* the Illinois Supreme Court stated, "We hold that this opinion shall be applied to ... all cases in which trial commences on or after June 8, 1981." *Id.* In 1986, the Illinois State Legislature modified its "purist position" on the negligence issue. During the 1986 session of the Illinois State Legislature, a tort reform act was passed. The new Ill.Rev. Stat. ch. 110, §§ 2–1107.1 and 2–1116 represents a modified form of comparative negligence for Illinois. Effective November 25, 1986, if a jury finds the contributory fault of a plaintiff is more than 50% of the proximate cause of the injury, the defendant must be found not liable for any negligent conduct on his behalf, even if a jury believes he was a 49% negligent defendant. In the instant case, since we are prepared to affirm the district court ruling that defendant was not at all negligent, the various forms of negligence law and their operative time periods in Illinois are of little relevance to us. However we feel compelled to note the important recent changes in Illinois negligence law in these pages at this point.

On October 25, 1978 at approximately 5:51 a.m. Raymond Davis called FAA weather briefer Robert Knize for weather information. Knize was located at an FAA flight service station in Rockford, Illinois. As an FAA weather briefer Knize provided pilots with weather summaries received from the National Weather Service (NWS). Davis was planning a flight from Dixon to Decatur, Illinois and, as is the routine procedure, he contacted the Rockford service station for a weather briefing. Weather briefers are middlemen, of sorts, transmitting weather information from various sources to pilots. Nonetheless, they are not robotic relayers. At the time pertinent to this lawsuit the FAA Handbook, Flight Services 7110.10D, stated the following duties for weather briefers:

166. REQUESTING WSO/WSFO ASSISTANCE

Do not issue weather forecasts, warnings, or advisories unless issued by an NWS office. When a forecast is inaccurate, request assistance from the appropriate WSO or WSFO....

168. CONDUCT OF PREFLIGHT BRIEFING

a. The object of a preflight briefing is to communicate to a pilot meterological and aeronautical information necessary for the conduct of a safe and efficient flight. Do not brief by reading weather reports and forecasts verbatim unless specifically requested by the pilot....

(b) Using all available weather and aeronautical information, provide the following data in the following sequence when it is applicable to the proposed flight:

Note: Specifically emphasize reports of temperature inversions, low level wind shear, thunderstorms, and/or frontal zones within 50 NM of the departure and arrival terminals....

(2) VFR Flight Not Recommended (VNR)—When VFR flight is proposed and the actual or forecast conditions, surface based or aloft, are such as to make visual flight (VFR) doubtful, advise the pilot by describing the condition(s) followed by the phrase "V–F–R flight not recommended."

Importantly, weather briefers are not weather forecasters. Further, they do not have any power to prohibit a pilot from flying his craft. The pilot, as *Spaulding* reveals and Pearl admits, is the ultimate master of his craft (see appellant's brief p. 23).

When Davis called Knize, Knize had various terminal forecasts and observation reports available to him for the briefing. A NWS forecast for 8:00 p.m. on October 24 (the previous day) to 2:00 p.m. October 25 warned of a low pressure center and associ-

ated cold front moving northeastward, affecting northwestern Illinois:

Minnesota, Iowa, Missouri, Wisconsin, Illinois, Michigan, Indiana, Kentucky, Lake Michigan, United States portions Lakes Superior andd [sic] Huron....

Synopsis. Low north-central border Minnesota with cold front trailing southward and high pressure ridging to Texas. Low will move northeastward with cold front swinging to eastern tip Lake Superior across northwestern Illinois to west-central Missouri and ridge weakens and drifts southeastward by 1400 Thursday. Significant clouds and weather. Northwestern two-thirds Missouri, southeastern two-thirds Iowa, northwestern two-thirds Illinois, southern and eastern Wisconsin, Upper Michigan, eastern two-thirds Lake Superior, Upper Michigan [sic], Lake Michigan. No significant clouds and weather. Becoming 0300–0900 ceilings 7,000–9,000 feet broken, top 12,000 feet with scattered light rain showers. Becoming 0700–1100 conditions 2,000–4,000 feet scattered to broken, ceiling 8,000–10,000 feet broken to overcast, top 14,000 feet, with scattered light rain showers and few thunderstorms and moderate rain showers Missouri. Cumulonimbus tops 35,000 feet. Icing. Occasional moderate rime or mixed icing in clouds above and possible severe in cumulonimbus above freezing level. Freezing level 3,000 feet northwestern Minnesota sloping to 12,000 feet southern Missouri to Kentucky.

(D.Ct.Op. at pp. 11–12).

At 2:20 a.m. on October 25, 1978 Knize received a second forecast, a NWS in-flight weather advisory (AIRMET). It was issued for the period between 2:20 a.m. and 8:20 a.m. on October 25. It declared a flight precaution for areas including Illinois and Lake Michigan and emphasized strong low-level winds and turbulence.

AIRMET Delta 2. Flight Precaution. Missouri, Iowa, southeastern two-thirds Minnesota, Wisconsin, Illinois, Michigan, northern Indiana, and Lakes Superior, Michigan, and Huron for strong low-level winds and turbulence. Winds at or above 30 knots within 2,000 feet of surface and occasional moderate turbulence below 4,000 feet. Continue advisory beyond 0820.

(D.Ct.Op. at p. 13).

Thirdly, "terminal forecasts" for Rockford and Decatur were available to Knize. The Decatur forecast was issued at 4:43 a.m. on October 25, valid for a 24 hour period starting at 5:00 a.m. Among other things, it called for an 11,000 foot broken ceiling. Finally, Knize had observation reports for Rockford, DuPage, Peoria and Decatur, the four stations which covered Davis' entire flight route. The Observation Reports set forth the following information in pertinent part:

*Rockford*

0455, measured ceiling 5,500 feet broken, 10,000 feet overcast, visibility 12 miles, temperature 49 degrees Fahrenheit, dew point 41 degrees Fahrenheit, wind 180 degrees 12 knots, altimeter setting 29.60 inches. 0548, local observation, 2,100 feet scattered, measured ceiling 3,600 feet broken, 5,500 feet overcast, visibility 12 miles, light rain showers, wind 190 degrees 11 knots, altimeter setting 29.61 inches.

*DuPage*

0450, ceiling estimated 9,000 feet broken, visibility 10 miles, temperature 48 degrees Fahrenheit, dew point missing, wind 190 degrees 12 knots, altimeter setting 29.65 inches.

*Peoria*

0455, ceiling measured 6,000 feet broken, 25,000 feet overcast, visibility 10 miles, light rain showers, temperature 49 degrees Fahrenheit, dew point 43 degrees Fahrenheit, wind 170 degrees 12 knots, altimeter setting 29.67 inches, rain began at 0413.

*Decatur*

0451, ceiling estimated 9,000 feet overcast, visibility 10 miles, light rain, temperature 51 degrees Fahrenheit, dew point 38 degrees Fahrenheit, wind 200 degrees 19 knots, gusts 24 knots, altimeter setting 29.75 inches, rain began at 0451.

*Moline*

0454, ceiling measured 2,200 feet broken, 5,000 feet overcast, visibility 5 miles, light rain, fog, temperature 51 degrees Fahrenheit, dew point 46 degrees Fahrenheit, wind 200 degrees 10 knots, altimeter setting 29.59 inches, ceiling ragged, rain began at 0411.

(D.Ct.Op. at pp. 14–15).

In addition to Knize's guidance, Davis had the services of Dorothy Wussow at his disposal, a fixed base operator who lives at the Dixon Airport. Wussow is a certified weather observer who counsels pilots on current weather conditions at the airport if requested. Davis did not use her. Finally, there is also a telephone available for pilot use 24 hours a day inside the Dixon Airport terminal. Davis only called Knize once at 5:51 a.m. He departed at approximately 7:20 a.m.

Pearl's first argument is that Knize gave Davis a forecast he knew (or should have known) to be inaccurate and that Knize should have called various other weather services for further assistance. We disagree. Pearl focuses on alleged differences between the Chicago area and Moline and Rockford area forecasts. She claims these differences are substantial and should have indicated to Knize that additional information was necessary to rectify the discrepancies. We believe the discrepancies in the various area forecasts were not so material and were merely indicative of the generally deteriorating weather conditions prevalent at that time. The Chicago area forecast called for broken ceilings at 7,000–9,000 feet between 3:00 a.m. and 9:00 a.m., topping at 12,000 feet with scattered light rain showers becoming 2,000–4,000 feet scattered to broken ceilings, 8,000–10,000 feet broken to overcast, topping at 14,000 feet with scattered showers late in the day. Pearl claims the Rockford forecast ceilings at 5,500 feet broken and at 10,000 feet overcast, Peoria at 6,000 feet and 25,000 feet and Moline at 2,200 feet and again at 5,000 feet indicated an alarming discrepancy. There was also a Rockford ground observation report at 5:48 a.m. of a scattered cloud layer at 2,100 feet and a ceiling of 3,600 feet.

We have surveyed and reviewed all the weather data in Knize's possession at that time and simply do not believe the figures indicate material discrepancies which should have alarmed Knize. The Chicago forecast was simply representative of the better end of varied weather conditions that were deteriorating. In an unsettled, deteriorating weather situation there are bound to be areas with conditions more favorable than others. Chicago appears to have been one of those areas. There were no material differences. Chicago called for light rain with worsening conditions as the morning progressed. So did the other stations. Further, Moline's forecast was within the scope of the varied and deteriorating conditions witnessed in the area and Knize's failure to relay the Moline forecast when the town was not in Davis' flight path was not negligent. The Moline weather reflected more of the same being experienced throughout the area. We fail to see any alarming differences in the forecasts and affirm the district court's ruling in this area.

Pearl also argues Knize negligently failed to warn Davis that a VFR flight was not recommended. We disagree. As stated earlier, a VFR certified pilot can fly at his own discretion until cloud ceilings or material cloud obstructions are less than 1,000 feet and visibility is less than three miles. At the time Davis called for his briefing none of the relevant areas in Davis' flight path had weather conditions which would have prohibited VFR pilots from flying. Hence, Knize had no duty to tell Davis a VFRs flight was not recommended when conditions were not in the prohibited range and, as the district court pointed out, it would have been error for him to do so (see FAA Handbook excerpt *supra*). If a VFR flight is doubtful, it is the pilot who decides how he should handle such a borderline situation (see *Spaulding, supra*).

We take time at this juncture to highlight Davis' own dubious conduct before departing. As stated earlier Davis called Knize at 5:51 a.m. He left his home at approximately 6:10 a.m. and arrived at the

Dixon Airport around 6:40 a.m. It was raining when Davis arrived at the airport; an investigation after the accident revealed Davis' car windshield wipers in the "up" position. Despite the fact that Knize had warned Davis of deteriorating conditions and that Dorothy Wussow, a certified weather observer was at the Dixon Airport at the time of Davis' departure, Davis failed to ask Wussow about a weather update or call Knize from a readily available telephone in the Dixon Airport terminal. Wussow described the weather at the Dixon Airport at that time as follows:

> Weather—Approx 500' overcast, raining, visibility 3/4 to 1 mile, at 7:00 a.m. on October 25, 1978 at Dixon Airport, Dixon, Illinois.

(D.Ct.Op. at p. 22).

Hence when Davis reached the airport we agree with the district court that he was seriously negligent in failing to recognize VFR conditions were doubtful in the area. Indeed, it appears they no longer existed. As Wussow revealed, conditions had seriously deteriorated from the time Davis had received Knize's report. Davis should have sought further assistance. As stated in *Spaulding*, "The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes ... A pilot cannot disregard weather conditions he sees around him." 455 F.2d at 226–27.

Pearl claims Knize was negligent in failing to hold Davis on the telephone at 5:51 a.m. until 6:00 a.m. so Davis could receive the latest hourly briefing. In the alternative, Pearl claims Knize should have arranged for Davis to call him back for the latest hourly observation report. We disagree. Davis was an experienced pilot who had a duty to know weather observation reports were taken on the hour. If he were prudent, he would have waited until 6:00 a.m. for the updated weather information (see *Redhead, supra*).

Pearl would have weather briefers like Knize refusing to give reports after 50 minutes after the top of the hour. She would also have weather briefers request pilots call back at the top of the hour for further briefing. This is impractical and places too burdensome a duty on the government. As the district court aptly observed, "Knize was not required to remind Davis of what every pilot should know, and he was not negligent for failing to do so." (D.Ct.Op. at p. 27). It was Davis who rather effortlessly could have contacted Wussow or Knize by telephone for an update. After all, Knize had additional pilots to brief about the deteriorating weather conditions. He had no duty to pamper individual pilots.[2] We find no negligence on Knize's part concerning this incident.

We add that assuming *arguendo* Knize's weather briefing was somehow deficient, Pearl has failed to persuade us the deficiency proximately caused the crash. Quite arguably Davis seemed intent to fly his airplane that day. Davis arrived under rainy conditions and saw no need to contact Wussow or Knize for an update. Although Davis may have relied heavily on Knize's report as Pearl suggests, it was Davis' negligence to rely on an hour old report once arriving at Dixon Airport under deteriorating conditions.[3] Pearl claims Davis'

---

2. See *Peters v. United States*, 596 F.Supp. 889, 896 (E.D.Pa.1984):

> "No duty is imposed upon controllers to warn pilots not to enter IFR weather conditions without a clearance, nor are they required to foresee or anticipate the unlawful or negligent ... acts of pilots." (Citing *Baker v. United States*, 417 F.Supp. 471, 488 (W.D. Wash.1975)).

3. See *Moorhead v. Mitsubishi Aircraft International, Inc.*, 639 F.Supp. 385, 395 (E.D.Tex.1986):

> ... According to the testimony of Fredrick Hoerner, which this Court credits on this point, "[A pilot] can't depend that heavily on

weather forecasts. You have got to go with what is happening now."

See also *Brown v. United States*, 790 F.2d 199, 204 (1st Cir.1986):

> ... the Weather Service is a particularly unfortunate area in which to establish a duty of judicially reviewable due care. A weather forecast is a classic example of a prediction of indeterminate reliability, and a place peculiarly open to debatable decisions, including the desirable degree of investment of government funds and other resources. Weather predictions fail on frequent occasions. If in only a small proportion parties suffering in conse-

accident was most likely caused by pilot disorientation due to thickened, low-level clouds. Pearl further claims Davis could not have accurately determined the cloud layers at Dixon Airport and was justified in relying on Knize's briefing. Yet we have already reviewed the fact that Davis drove to the airport in the rain. We have also reviewed Certified Weather Observer Wussow's description of weather conditions at the time of Davis' arrival at the Dixon Airport and the description indicated an observable difference from Knize's hour old report indicating deteriorating conditions. This should have triggered precautionary responses on Davis' part. Knize cannot be held negligent for Davis' unforeseen negligence in failing to take proper safety precautions. As stated in *Black v. United States*, 441 F.2d 741, 744 (5th Cir. 1971):

> It was the pilot's responsibility to obtain a weather briefing before leaving Baton Rouge.... If he had done so he would have discovered in advance that there were thunderstorms ahead of him.... Blind reliance on lack of information, assuming that he did so rely, could scarcely absolve him from the affirmative duty of seeking information that was readily available to him on inquiry....

In *Peters, supra* it was stated:

> ... When the weather began to deteriorate, Mr. Peters knew or should have known that he would encounter IFR conditions. A pilot "cannot ignore the weather information he has been given or disregard the weather conditions he sees around him." The decedent's "penetration into the clouds knowing that he could not navigate visually within them was as imprudent an act as driving into mid-ocean without knowing how to swim...."

596 F.Supp. 895–96 (citations omitted).

Further complicating Pearl's proximate cause argument is the fact that Kenneth Garner, an eyewitness to the crash, testi-fied he witnessed "something" separate from Davis' aircraft before it fell to the ground. Garner also testified the plane was traveling at a high rate of speed. Hence an excessive rate of speed and equipment difficulties must be added to any proximate cause analysis in this case. In sum, not only do we conclude Knize did not act negligently, but Pearl also fails to persuade us that Knize's weather briefing had anything to do with the Davis crash.

Finally, before closing we must address plaintiff's argument that the district court abused its discretion in disallowing Robert Rudich's testimony concerning the proper performance of a Flight Service Specialist. Pearl claims Rudich had more than 30 years of experience as a Flight Service Specialist, Senior Air Traffic Controller, lecturer, project manager and accident investigator which should have been sufficient to qualify him as an expert in flight safety. Yet Pearl admits Rudich had never personally provided an analytical weather briefing. Pearl argues he had other skills which should have been recognized despite actual experience. Nevertheless, the fact remains that Rudich testified he never performed a weather briefing of Knize's type, that he was never employed by the FAA or NWS as a weather briefer, that he had not written any articles on the subject and that he was never a member of the National Association of Air Traffic Specialists. The district court decision in this area will be reversed only upon a clear showing of abuse of discretion. *United States v. Devine*, 787 F.2d 1086, 1088 (7th Cir.1986); *Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226, 1241 (7th Cir.1982), *aff'd.* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). We see no abuse of discretion here as Rudich's expertise concerning Knize's duties was dubious at best. We note plaintiff was allowed to present the testimony of a man named McCaleb, who the district court had noted was quite qualified, having written a manual for the guidance of pilots who accept weather

---

quence succeeded in producing an expert who could persuade a judge, as here, that the government should have done better, the bur-

den on the fisc [sic] would be both unlimited and intolerable....

briefings. We see no reversible error in the district court ruling here.

For the reasons set forth above, the ruling of the district court is hereby

AFFIRMED.