Harry H. SONNEMAKER, Jr., ex'r of Estate of Michael W. Sonnemaker, dec'd., Plaintiff,

v.

UNITED STATES of America, and Cessna Aircraft Company,[1] Defendants.

No. 88–2297.

United States District Court, C.D. Illinois, Danville Division.

Nov. 2, 1992.

Susan E. Loggans, and Christopher Hurley, [COR LD NTC], Susan E. Loggans & Associates, Chicago, IL, for plaintiff.

David H. Hoff, [COR LD NTC], Asst. U.S. Atty., Danville, IL, John E. Wells, IV, [COR LD NTC], Patrick E. Bradley and Luke Marsh, [COR LD NTC], U.S. Dept. of Justice, Washington, DC, for the U.S.

John W. Adler, [COR LD NTC], Catherine E. Tinker, [COR LD NTC], Richard J. Durden, [COR LD NTC], Richard DeVuono, [COR LD NTC], Adler Kaplan & Begey, Chicago, IL, for Cessna Aircraft Corp., defendant.

MEMORANDUM OPINION [2]

BAKER, District Judge.

On New Years Eve day, December 31, 1986, at about 2:30 p.m. C.S.T., Michael W. Sonnemaker, the plaintiff's decedent, left his office to begin a flight from Peoria, Illinois to Orlando, Florida. He flew a Cessna Centurion airplane he owned jointly with his father and others. The co-pilot on the flight was David Groff and the two passengers who embarked in Peoria were Sonnemaker's wife, Susan, and a friend. The plane flew to Springfield, Illinois, where it took on two more passengers. There were six adults in the plane with luggage and a full load of fuel when it departed from Springfield.

Before leaving on the flight, at about 3:20 p.m. C.S.T., Michael Sonnemaker received a telephone briefing about enroute weather from the Flight Service Station at Quincy, Illinois. Quincy reported cloud tops at 24,000 feet and icing to that altitude. At Springfield, the tower relayed a message to Mr. Sonnemaker from the Quincy station that there was a severe weather warning for Southern Florida, including Orlando. The flight proceeded under instrument flight rules and landed at Huntsville, Alabama, where the plane was fueled and Michael Sonnemaker received

---

1. The plaintiff settled with the defendant Cessna before trial.

2. This writing also contains the findings of fact and conclusions of law required under Fed. R.Civ.P. 52.

another weather briefing. This briefing by telephone at 7:57 p.m. E.S.T. was given by the Flight Service Station at Muscle Shoals, Alabama. A low pressure center was stationed in the Gulf of Mexico just west of Gainesville and Jacksonville, Florida, and a trough of low pressure extended northeast into the Carolinas. The temperatures to the northwest of the front were fifteen to twenty-five degrees Fahrenheit cooler than the temperatures to the southeast of the front. As the witness Hunt summarized the weather in his testimony: from Albany, Georgia, southeast along the track of the flight the weather was deteriorating with stronger winds and dropping visibility, icing, turbulence and instrument meteorological conditions.[3]

The flight landed at Huntsville, Alabama, at about 7:30 p.m. E.S.T. and departed for Orlando, Florida, at 8:29 p.m., E.S.T.[4] At 7:57 p.m. E.S.T., while on the ground at Huntsville, Michael Sonnemaker telephoned the Muscle Shoals, Alabama Flight Service Station and received a complete weather briefing for a flight from Huntsville to Orlando. Mr. Sonnemaker filed an instrument flight plan for the trip from Huntsville to Orlando. At 9:30 p.m. E.S.T., while enroute near Columbus, Georgia, at an altitude of 9,000 feet, the flight requested permission to shift from the Columbus Control Approach frequency to the radio frequency of the Atlanta Flight Service Station. That was granted and it is a fair inference that the flight received an updated weather briefing on its planned route.

When the flight returned to the Columbus Approach Control frequency at 9:44 p.m. E.S.T., the pilot requested authority to descend to 7,000 feet which was granted. At 10:15 p.m. E.S.T., near Valdosta, Geor-

gia, the flight secured permission from the Valdosta Approach Control to descend to 5,000 feet. At 10:36 p.m. E.S.T., the flight was instructed to contact the Jacksonville, Florida Air Traffic Control Center.

At 10:37:12 p.m. E.S.T.,[5] the plane contacted the Jacksonville Control Center and at 10:37:48 p.m. E.S.T., asked:

> Jacksonville Center, are you painting any adverse weather ahead of niner eight Alpha?

The air traffic controller, Jerry Bender, replied:

> Yeah, there's some precip there, uh, just north of Gainesville; don't look too bad, and let me get a route readout here on you; just a second; okay, your route looks pretty good right on down towards Orlando.

At 10:43 p.m. E.S.T., the flight experienced a radical change in altitude: first it rose 500 feet in one twelve-second sweep of the radar cursor and then dropped 1300 feet in the following twelve-second sweep, and had disappeared from the air traffic controller's radar scope by the time of the third sweep. The controller's attempts to establish radio contact were unsuccessful. The plane, it was later determined, had experienced downward stress fractures of both wings and stabilizers and had fallen to the ground near Jasper, Florida. All six occupants perished.

It is the plaintiff's theory of the case, and the basis of its claim against the defendant, that the United States, through its air traffic controller, Jerry Bender, was negligent for failing to inform Michael Sonnemaker that there was adverse weather in his flight path.[6] Radar readings will show

---

3. No recordings of any of the weather briefings given the pilot are available but there is no conflict in the evidence as to what the meteorological conditions were in the southeast United States.

4. The plane was loaded as it had been when it left Springfield, Illinois. There is evidence that the total weight of the passengers, fuel and luggage exceeded the design limits of the aircraft and that the weight was distributed too far aft of the airplane's center of gravity. Because of the conclusions reached by the court on the

issue of the government's negligence, it is unnecessary to make findings concerning the weight and loading of the aircraft as a proximate cause of the occurrence.

5. The court has converted all times that were reported in Universal Coordinated Time to local time.

6. "The air traffic controller is required to give all information and warnings specified in his manuals, and in certain situations he must give warnings beyond the manuals." *Davis v. U.S.,*

precipitation, but they will not reveal turbulence or wind shear. An air traffic controller's principal job is maintaining separation of the aircraft in his sector and his radar scope has as its primary function the tracking of those aircraft. To that end, the controller's primary radar is in circular polarization that will eliminate precipitation from the radar scope that is not of avigationally significant intensity. High intensity precipitation will appear on an air controller's radar scope. Radar echoes from precipitation of between 12 and 23 decibels are displayed on the controller's screen as lines. Precipitation of an intensity sufficient to produce echoes above 24 decibels are displayed as H's on the controller's scope. Air controller Bender's radar scope did not receive returns from just one radar but received returns simultaneously from several radars, one of which was in linear polarization and would have received precipitation echoes.

Bender testified[7] that he had no lines or H's displayed on his radar scope and that he had made an accurate report to Michael Sonnemaker that the air traffic control radar showed no heavy precipitation in the flight path.[8] The plaintiff argues that the evidence does not support Bender's testimony and that the testimony of ground observers showed a heavy thunderstorm in progress at the site of the crash. The plaintiff's witness Ralph Huschke, a meteorologist, formed the opinion from ground observation reports that there was a heavy thunderstorm in progress at the site of the crash but agreed also that if all the witness had was radar to rely upon, he would not have known that there was heavier precipitation ahead of the aircraft track than the precipitation back, northwest along the aircraft track. The defendant's witness, Lee Hoxit, also a meteorologist, had a different opinion about the presence of a thunderstorm at the site of the crash but agreed there was at least one thunderstorm in the vicinity. Hoxit and Huschke shared the opinion that from the information that was recorded and available at the time, they could not have said a thunderstorm was present. Defendant's Exhibits 24–1 to 24–7 corroborate that analysis. The exhibits are enlarged prints of photographs of the Waycross, Georgia[9] Weather Station radar taken at five-minute intervals during the period between the flight's request for information shown on air traffic controller Bender's radar scope and a few minutes after the plane disappeared from the radar. Specifically, defendant's Exhibits 24–6 and 24–7 show no precipitation along the path of the flight and that Bender's response was accurate. It is also significant that the Waycross radar was not on circular polarization and would not have filtered out precipitation.

Plaintiff's Exhibit 1, page 134, the National Transportation Safety Board report on the occurrence,[10] shows the track of the aircraft and precipitation primary returns over a twenty-three minute period of time that were recorded on the air traffic control radar at Jacksonville. At the bottom of the track there are clusters of delta shaped symbols. No witness was able to give an explanation of what those symbols signified in the way of precipitation intensity. No witness was able to say how, if at all, those symbols would have been dis-

---

824 F.2d 549 (7th Cir.1987), quoting *Spaulding v. United States,* 455 F.2d 222, 226–27 (9th Cir. 1972).

Choice of laws was an issue upon which the parties disagreed. The court chose Florida law as the law governing the case. The basis for that ruling is set out in the transcript of the trial. The choice has no practical effect on the outcome, however. The difference between Florida law and Illinois law, as they might apply to this case, lies in the plaintiff's right to recover for emotional distress and consideration of the plaintiff's contributory conduct on the basis of pure comparative fault. The court had no occasion to reach those two questions.

7. Bender died before trial but his testimony had been preserved by way of deposition.

8. Heavy precipitation might have indicated the presence of a thunderstorm and turbulence, considering all the other meteorological data that was available.

9. The Waycross, Georgia Weather Station is about sixty miles away from Jasper, Florida.

10. The same information appears at tab 8 of the defendant's bench book.

played on Bender's radar scope.[11] The witness Beaudoin, an experienced air controller whom the court found to be credible, thought the symbols were low intensity precipitation and would not have appeared on Bender's scope. Beaudoin said the delta signs certainly would not have appeared as H's or lines that Bender would have been required to report to a pilot who requested, "What are you painting?"

■ To be successful on the issue of liability, the plaintiff must persuade the court that there were lines or H's on Bender's scope that he failed to report to Michael Sonnemaker upon his inquiry, "What are you painting?" The court finds that proposition is not more likely than unlikely. The court is not persuaded that there were lines or H's on Bender's scope that he failed to report on inquiry.

■ An alternative theory of liability that the plaintiff advances is that Bender was under a duty to warn Michael Sonnemaker that the air traffic control radar was on circular polarization and that precipitation was filtered out. Or, that Bender should have taken some affirmative steps to look more closely at the weather in the flight's path. Under ATC Rules § 7110.-76B and ATC Manual 2–2, 2–100, and 2–103, Bender was under a duty to give correct and adequate available weather information to a pilot who asked and to suggest alternative routes when requested. The pilot, the testimony shows, is primarily responsible to stay briefed on the weather. The testimony also shows that the air traffic controller supplies precipitation information that is before him on his radar. The court finds that there was nothing before air traffic controller Bender that would have alerted him to high intensity precipitation in the path of the aircraft. In fact, the Waycross weather radar did not show any significant precipitation ahead in the aircraft track. Bender had a right to

assume that the pilot was cognizant of the general meteorological conditions and was not required to give the pilot a detailed weather briefing. Detailed weather briefings are the province of the Flight Service Stations and the air traffic controller had the duty to separate aircraft and to respond with information before him as he did. The court finds that Bender exercised the degree of care that would be expected of reasonably prudent air controllers acting under the same or similar circumstances.

The opinion of the witness Warren Hunt, because of his background and experience in the United States Air Force as a pilot and accident analyst, is reliable and credible. Certainly the weather was a contributing factor in the occurrence when the flight crossed through the frontal trough. But the weight of the evidence does not support the conclusion that Bender saw heavy precipitation on his radar scope and failed to apprise the pilot of its existence. The most probable inference to be drawn from the evidence is that the pilot flew under conditions that were beyond the capabilities of the aircraft and put himself into a position from which he could not recover.

This to be sure was a most tragic occurrence but the plaintiff had the burden of persuading the court that the existence of negligence on the part of the United States was more probable than its nonexistence. The plaintiff has not done so.

The Clerk is directed to enter judgment in favor of the United States and against the plaintiff and for costs of suit.

---

**11.** The plaintiff argued that the court should construe the failure of the FAA to supply information to the plaintiff's expert Rudich as proof that the defendant concealed evidence that was prejudicial to the defendant. The testimony supports the inference that everyone had the same information on the plane's track from the FAA and that the FAA provided the information it had recorded. The court finds insufficient basis to conclude that the FAA concealed information. *See* the witness Beaudoin's testimony about what the radar system will record and what for various reasons it may not record.