Laura J. BAUER, as Executor of the Estate of John H. Bauer, Deceased; and as Executor of the Estate of William H. Bauer III, Deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 00 C 8075.

United States District Court, N.D. Illinois, Eastern Division.

Oct. 10, 2002.

---

Todd A. Smith, Kenneth J. Merlino, Power, Rogers & Smith, P.C., Chicago, IL, for Plaintiff.

Justin Chretien, United States Department of Justice, Washington, DC, for Defendant.

### FINDINGS OF FACT

LEINENWEBER, District Judge.

1. This Federal Tort Claims Act case arises out of the death of three passengers, John H. Bauer, William H. Bauer III and Terry A. Spurgin, aboard a Beechcraft A–36 airplane bearing FAA registration No. N1812A, which crashed while en route from Louisville, Kentucky to Aurora, Illinois on March 20, 1998. The pilot was Daniel L. Sanders who is not a party to this suit. The executors of the estates of the three deceased passengers bring these cases. The plaintiffs allege that the United States, through the Federal Aviation Administration (the "FAA"), Flight Service Station ("FSS") personnel, and Air Traffic Control ("ATC") personnel committed numerous negligent acts and omissions which contributed to cause the deaths of the three passengers.

2. The plaintiffs contend that the FSS pre-flight weather briefing was inadequate; the ATCs at the Evansville Center failed to solicit pilot reports of inclement weather, and failed to pass on to Sanders the pilot reports that they had in fact

received; and that the ATC at Terre Haute, Jennifer Stahley, failed to provide information concerning the availability of the airport at Robinson and provided improper vectoring to Sanders which created confusion. The plaintiffs contend that all of the foregoing were proximate causes of the crash.

3. The United States contends that the cause of the air crash was pilot error. The pilot left Louisville en route to Aurora, Illinois in the face of weather reports and forecasts that he would be flying through icing conditions for virtually his entire route. The icing conditions that he encountered caused an ice buildup on the aircraft which in turn caused the crash. The United States contends that location of the crash shows that the pilot could not have made the VOR approach to either the Sullivan airport or the Robinson airport, so that any incorrect vectoring was not a proximate cause of the crash. Instead of proceeding northward, the pilot should have returned to Louisville as soon as he encountered icing.

4. The National Weather Service provides a wide variety of weather forecasts, observations and analytical products which it makes available to flight Service Stations. This information is obtained from radar and weather satellites. Advisories, called AIRMETS, are provided to general aviation to inform pilots of hazards and are issued from the Weather Center at Kansas City, Missouri, and can cover multi-state areas. Center Weather Advisories ("CWAs"), are locally issued (here Indianapolis) and cover much smaller areas. There are several types of AIRMETS, but the one in issue in this case is an AIRMET ZULU, which is an AIRMET reporting icing conditions. Both an AIRMET and a CWA are forecasts. Another source of weather information is a pilot report ("Pirep"). This consists of a weather observation by a pilot of actual conditions encoun-

tered. The Pirep usually consists of the observation, the type of aircraft, altitude, and the direction the plane is heading. Flight Service Stations are the primary source for obtaining pre-flight weather briefings and in-flight weather information. The latter are available on designated frequencies called Flight Watch. Prerecorded in-flight weather advisories, including the AIRMETS, are continuously broadcast on the Hazardous In-flight Weather Advisory Service ("HIWAS") frequency. Both Flight Watch and HIWAS were available to Sanders.

5. To have icing conditions, there needs to be below-freezing air temperature and visible moisture, e.g., clouds. There are two types of icing that are relevant to aviation: rime icing and clear icing. Rime icing is caused by freezing of micro droplets. When the droplets freeze, some air is trapped and the result is something similar to frost and can attach to the airplane. When water droplets are bigger than micro droplets, the drops hit the plane, lose their shape, run backwards and form clear ice. Freezing rain is caused by a temperature inversion whereby rain starts to fall in above freezing conditions, falls through an area that is below freezing, and freezes upon contact with the ground or, for example, an aircraft wing. "Mixed" is where there is a combination of rime and clear icing. Build up of icing, either rime, clear or mixed, tends to destabilize the plane.

6. During the late afternoon and early evening hours of March 20, 1998, a low pressure storm system was moving through the Ohio Valley. Precipitation in this region was mostly light snow and/or freezing rain or drizzle. As the low pressure system moved eastward there occurred a so-called "wraparound effect" of winds blowing counterclockwise, i.e., generally from the north to the south behind

the low. This had the effect of decreasing temperatures in the southern portions of Indiana and Illinois. An AIRMET ZULU was issued at 5:00 P.M. EST, valid until 10:00 P.M. forecasting occasional moderate mixed/rime icing in clouds and precipitation between surface and 16,000 feet northeast of the Bradford–Cincinnati line and between 3,000 feet and 16,000 feet below, which included the area between Louisville and Indianapolis. Three pilot reports had been received at the Louisville FSS at Sandiford Airport, one from a Cessna 195 who reported light to moderate rime icing that was shed when he descended from 4,000 feet to 3,000 feet, another from a Cessna 340 who reported moderate to severe mixed icing at 6,000 feet, and one from an Aero Commander reporting light rime icing at 7,500 feet near Lafayette, Indiana. The surface weather conditions at Louisville at 6:56 P.M. were: Wind 220 degrees at 5 Knots; Visibility 10 miles; Sky Condition few clouds at 600 feet scattered, 2,700 feet overcast; and Temperature 7 C. Temperatures tend to get colder at higher altitudes except in the case of an inversion. It is estimated that the temperature at 4,000 feet was close to 0 C. The surface weather conditions at Terre Haute at 7:53 P.M. were: Wind 360 degrees at 11 Knots; Visibility 10 miles, light rain; Sky Condition overcast at 1,200 feet; and Temperature 1 C.

7. At approximately 6:18 P.M. on March 20, 1998, Sanders called the Louisville FSS by telephone indicating his intention to fly from Louisville to Aurora, Illinois, leaving about 30 minutes later. The pilot expressed concern about projected icing conditions. The briefing that was provided was as follows:

"Ok there is an AIRMET for occasional moderate rime or mixed icing along the entire route of flight ahm three thousand to sixteen thousand here locally up north it's from the surface to sixteen thousand up there in the Aurora area and AIRMET for occasional I–F–R conditions along the entire route of flight. Turbulence at occasional moderate below eight thousand. That's it on the flight precautions. Ahm low pressure currently located in get a hold of it here extreme eastern Kentucky. Its moving slowly to the east as it does it should pull some of the moisture with it but well what you'll be encountering affecting your route of flight is the wrap around effect on that low pressure."

\*     \*     \*     \*     \*     \*

"Ok. Currently . . . Sandiford reporting a ceiling of five hundred broken, two thousand eight hundred overcast. Ten miles surface wind two two zero at Seven and ah up through Terre Haute area they're getting some snow there. Now two and a half mile surface visibility light snow and mist ceiling are eight hundred broken and Aurora is reporting twenty five hundred scattered nine thousand overcast. Fifteen miles is the visibility and surface winds zero three zero at one eight. Peak gusts to two six temperature at Aurora two degrees dew point minus three and pilot reports see here in the Louisville area Cessna one ninety five light to moderate rime icing. He lost the ice at three thousand. . . . I guess it was coming down cause he was previously at four and ah six thousand in Louisville area."

\*     \*     \*     \*     \*     \*

Up at Lafayette at a seventy-five hundred feet a p-a Aero Commander light rime from seventy five hundred to eight thousand at Page at four thousand two hundred light turbulence below four thousand. That's it in pilot reports.

When asked if he wanted any more information, Sanders declined, replying that it "was all you can get for me right now."

8. Sanders, during the briefing, stated that he had the Chicago area forecast which did not include "a whole lot of icing reports." He also indicated that he had the AIRMET because when the briefer was describing the AIRMET and the low pressure area, Sanders stated that he was "looking at it right now." The briefing concluded at 6:22 P.M.

9. At 6:52 P.M. Sanders again called the FSS to file his flight plan. The plan called for N1812A to leave Louisville at 7:15 P.M. and fly at 4,000 feet to Springfield, Illinois, and then northward to Aurora, forecasted flying time of one hour, fifty-eight minutes. The Service briefer than asked if he needed a weather briefing. Sanders replied that he did not because he had received one earlier. The briefer then reminded him that he could always get an update with Flight Watch or Flight Service.

10. While traversing a portion of the Evansville Control Center air space, Sanders asked if the controller had received any Pireps concerning icing in the area. The ATC, Kyle Koop, told him that there had been none in the last two hours. There had, however, been two Pireps of icing, one by an aircraft with the call sign N371JD ("Juliet/Delta") which had been received 55 minutes earlier from a position approximately 30 miles away, at an altitude of 8,000 feet descending to 2,500 feet. The pilot of Juliet/Delta reported that he had continued to pick up ice until he descended below 4,500 feet and that the ice began to come off at 2,500 feet. The second was from an aircraft at 7:01 P.M., call sign N160PB ("Papa/Bravo"), which, after takeoff from Evansville, radioed that he was picking up some "light mixed" at 7,000 feet. He was asking permission to go to 9,000 feet to get between cloud layers. The plane at this time was over French Lick, Indiana, and was about to leave the Evansville air space for Louisville.

11. At 7:45 P.M. Sanders contacted Approach Control at Hulman Airport, Terre Haute, Indiana and requested icing reports in that area. The Controller, Jennifer Stahley, told them that the Center had not had any since one received two hours previous which reported light to moderate mixed at or below 5,000 feet. Four minutes later Sanders asked and received permission to descend to 3,000 feet. At 7:52 P.M. Sanders reported that he had started to accumulate ice, which he did not believe he could shed, and asked permission to land at Terre Haute. Stahley immediately cleared him to do so and provided him with the weather there. At 7:55 P.M. Sanders was authorized at his discretion to descend to 2,500 feet. At 8:01 P.M. Sanders reported that he was losing air speed and requested a closer airport. Stahley immediately advised him that Sullivan Airport was 5 miles ahead of him and he had a choice of two published approaches: a VOR–Alpha approach or an NDB (Non-Directional Beacon) approach. The VOR involved several turns of the aircraft because the Alpha means that the runway is more than 30 degrees offset. The NDB approach on the other hand was almost straight-in. However, the VOR–Alpha is an easier approach to execute because the pilot knows his exact distance relative to the airport, which he does not have using the NDB approach. Stahley did not advise him of Robinson Airport, which was located in Illinois, and was located eleven miles almost due west of his line of flight. Sanders chose the VOR–Alpha approach and Stahley attempted to vector him to the approach gate. At 8:04 P.M. Stahley told Sanders that he was "about two and a half miles from Rodeo" and that he should turn right heading zero two zero and maintain his altitude at 2,500 feet until on the VOR. The final radio contract with Sanders occurred one minute later when he stated "heck we're all over the place right now

for one two alpha." Stahley provided him with missed approach instructions but Sanders never responded. At about this time all radar and radio contact was lost. About one minute later the plane crashed at a point approximately 5 miles south of the Sullivan Airport.

12. The National Track Analysis Program ("NTAP") provides data recorded at Indianapolis which provides the location, speed, direction, and altitude of aircraft within radar reach. According to the final data inputs, N1812A was maintaining calibrated speed (i.e., true speed based upon ground speed and wind) of the aircraft in the neighborhood of 116 to 120 Knots. Calibrated stall speed of this aircraft was approximately 68 Knots. However, ice will increase the stall speed. The plane was descending from 2,500 to 2,300 feet and was at a heading of 342 degrees which, according to the NTAP data would have had the plane intercept the rodeo if maintained. However if the plane had gone to 020 degrees at that point, it would have gone directly to the airport. The plane according to the NTAP data was approximately 5 miles from rodeo rather than the two and one half miles estimated by Stahley. There are a number of possible reasons for the discrepancy. Stahley could have made a mistake and given Sanders the wrong vector and distance. The radar at Terre Haute is more accurate than the radar providing the NTAP data so that the NTAP data could have been wrong. The former gets a hit every 4.6 seconds while the latter gets a hit every 12 seconds. This provides a possible error rate of up to 10 seconds or, at the speed of N1812A, of up to 2,000 feet. Also, Stahley had to incorporate a lag time between the issuance of a vector and the pilot's response. In any event, the crash site was at a point at what appears to be at a 45 degree heading from the last radar hit and was approximately one and one half miles to the east. The plane landed on an approximate 063 degree heading in a field near New Lebanon, Indiana, at a point approximately 5 miles almost due south of Sullivan Airport.

13. The Plaintiffs' aircraft was a Beechcraft A–36 Bonanza, manufactured in 1981. It had been inspected and overhauled at appropriate times. It was equipped with Northstar Global Positioning System, RNAV, VOR and NDB equipment as well as an autopilot. The plane also had a temperature gauge which would inform the pilot of the actual air temperature in the plane's environment. It had no deicing equipment. There was no evidence of an equipment malfunction. The plane flight manual and a placard in the interior of the plane carried the following warning: "FLIGHT IN KNOWN ICING CONDITIONS IS PROHIBITED."

14. FAA Order 7110.10M at Section 2, governs pre-flight weather briefings. Plaintiffs claim that the Louisville specialists were deficient in their weather briefings because they did not identify the freezing level on the AIRMET ZULU, did not accurately identify Pireps, did not provide en route weather, winds aloft and Notices to Airmen. FAA Order 7110.65L, Chapt. 2, Section 6 provides the requirements for Air Traffic Controllers with regard to weather. It requires a controller to become familiar with the weather when he comes on duty, to stay current and to solicit Pireps and to relay them in a timely manner. The plaintiffs charge Kyle Koop with violating this FAA order by not actively soliciting Pireps and not relaying the two he received (from Juliet/Delta and Papa/Bravo). FAA Order 7110.10M also creates obligations on the part of the controllers to provide proper vectoring, to provide maximum assistance in an emergency. Plaintiffs charge that Stahley failed to ask the appropriate questions of the pilot so as to obtain altitude and air

speed and give him proper vectors. She also had an obligation to offer the pilot alternative airports.

15. The Plaintiffs called five experts on air traffic issues and the Defendants called three. These experts all had similar backgrounds and expertise. All or almost all have dueled against each other in court before. The Plaintiffs' experts in FAA cases normally give opinions for claimants, while the defense experts are normally called by the government. As is usual in these cases, the experts gave diametrically opposing conclusions based on identical facts. The Plaintiffs' experts found no fault on the part of the pilot and the defense experts found no fault on the part of the FAA personnel. The Court finds neither conclusion completely supportable, *i.e.*, there were errors committed by the pilot, and there were errors committed by the FAA personnel. However, the errors committed by the pilot were the proximate cause of the crash, while the errors committed by the FAA personnel were not, as will shortly be seen.

16. The cause of this crash was icing. Neither side disputes this fact. Therefore, to prevail on the facts the plaintiffs must show by a preponderance of the evidence that some act or omission on the part of the flight service briefer, or a traffic controller was a proximate cause of the icing and/or the inability of Sanders to land the plane safely. The primary responsibility of the flight service station briefer is to make the pilot aware of adverse weather conditions. The briefer at Louisville provided Sanders with the AIRMET ZULU which told him that there would be occasional moderate rime or mixed icing along his entire route of flight, at that time straight from Louisville to Aurora. He pointed out that locally the icing condition started at 3,000 feet and would descend to ground level as he proceeded north. He reported that at Louisville he would have a

ceiling of 2,800 feet, a mist ceiling at Terre Haute of 800 feet and snowing. He also reported two area Pireps of icing, one of which was clearly in his flying altitude. Plaintiffs argue that this Pirep was actually from a point 60 miles south of Louisville but the pilot was led to believe that it was local to Louisville. However, this is not a good argument to absolve the pilot of error. It would be reasonable to assume, since the cold weather was coming from the north to the south, that in all probability the conditions would be similar or worse at Louisville. The improper location of the Pireps would certainly not put Sanders' mind at ease by implying icing was less likely; it would or should have had the opposite effect of leading him to believe that icing was more probable. It is also clear from Sanders' response that Louisville FSS was not his only source for weather information. He certainly had the Chicago weather and his change from a direct-to-Aurora route to a Louisville–Springfield–Aurora route indicates that he was trying to avoid weather in central Indiana for which there was an area forecast which included freezing rain. It is therefore clear that Sanders was made aware and, in fact, was aware of the strong possibility that he would encounter icing on his flying route, whether it was a direct one or through Springfield. Therefore the court finds that nothing that the Louisville FSS briefers did or did not do was a proximate cause of the icing and subsequent crash.

17. When Kyle Koop told Sanders that he had not had any Pireps of icing in two hours, this was true for Koop. His colleague, Ted Borchelt, had received one about 55 minutes before Sanders' request but the pilot was at a position 30 miles away from plaintiffs' location and was at an altitude of 8,000 feet although the pilot reported losing ice at 2,500 feet. This report was not relevant to Sanders' posi-

tion. Otherwise, Sanders would have thought he could lose ice when he descended to 2,500 feet a short time after his conversation with Koop. The other Pirep, while on Sanders' route of flight, reported picking up some light mixed at 7,000 feet which was 3,000 feet over Sanders' altitude. Neither of these Pireps therefore would have been useful in advising Sanders to change his course.

18. There is some evidence that Stahley may have given Sanders an improper vector while directing him to the VOR–A for Sullivan. However, we really cannot say for certain whether it was improper or not because of the possible discrepancy between the Indianapolis radar and Terre Haute radar. If Sanders was 2,000 feet further along to the west than the NTAP data showed, then the vectoring could well have been accurate. Moreover, he obviously did not proceed on the alleged inaccurate 020 vector. Sanders did not tell Stahley that the icing condition of his plane was too dire to allow for revectoring, which was what she was trying to do when he left the radar screen. Since Sanders presumably had the approach plate for Sullivan available, he knew that his selected approach required substantial vectoring from his position at the time of his selection. He also knew that the NDB approach was relatively straight in and therefore was a much shorter distance. It is clear, based on the short interval between the turn to the southwest for the VOR–A approach and the crash, that once the pilot set out on this course he would not be able to land at Sullivan or for that matter Robinson which was 6 miles further than Sullivan.

For either the improper vectoring or the failure to offer Robinson airport as an alternative to be a proximate cause of the crash, the Plaintiffs needed to prove by a preponderance of the evidence that it was more likely than not that proper vectoring or landing at Robinson would have led to a safe landing. This Plaintiffs failed to do. The only evidence offered was the testimony of Plaintiffs' expert, George Clark, that he believed the plane had enough energy to land at Robinson. But he was impeached with his testimony when he admitted that it was "problematic" for the aircraft to reach Robinson, although it was "possible." While Sanders' comment that "heck, we're all over the place" might be a statement showing confusion as urged by Plaintiffs, it might just as easily have been a description of extreme instability of his aircraft as a result of icing.

Therefore the court finds that neither the vectoring nor the failure to direct to Robinson was a proximate cause of the crash. Rather the pilot's decision to make the VOR–A approach to Sullivan was a proximate cause. Only about 14 minutes elapsed between Sanders' first complaint of icing and the fatal crash. There was only four minutes between his selection of the VOR–A landing and the crash. It is apparent that the icing build up occurred much more rapidly than Sanders anticipated.

19. The court finds that when Sanders took off from Louisville along a flight plan, which he knew or reasonably should have known, put him and his passengers in grave danger of an ice build up, this was negligence and the proximate cause of the fatal crash.

### CONCLUSIONS OF LAW

1. Under Indiana law, negligence consists of three elements: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) injury to the plaintiff proximately caused by that breach. *Bader v. Johnson*, 732 N.E.2d 1212, 1217 (Ind. 2000). A negligent defendant is liable if his action is a proximate cause of the

plaintiff's injury. *Control Techniques Inc. v. Johnson,* 762 N.E.2d 104, 108 (Ind.2002), and he is not liable if his negligence is not the proximate cause of plaintiff's injury. *Marquez v. Mayer,* 727 N.E.2d 768, 772 (Ind.Ct.App.2000).

■ 2. The Air Traffic Control Service has no duty to restrain a pilot from taking off into a hazardous weather condition or offer a gratuitous opinion that he should delay his flight. In conditions where judgment is exercisable, the decision as to whether and when weather conditions permit a take off is up to the pilot. *Spaulding v. United States,* 455 F.2d 222 quoted in *Davis v. United States,* 824 F.2d 549, 551 (7th Cir.1987).

3. The national Transportation Safety Board has determined that flight into forecasted and reported icing conditions constitutes careless or reckless operation of an aircraft in violation of 14 C.F.R. § 91.13; *Administrator v. Boger,* NTSB Order No. EA–4525, pp. 3–4, Feb. 5, 1997.

4. The pilot violated 14 C.F.R. § 91.9 when he flew into known icing conditions where the manual contains prohibition against flying into such conditions.

■ 5. Controllers have no duty to warn pilots about conditions of which the pilot is or should be aware of through the pilot's training, experience, or observations. *Davis* at 555.

■ 6. The proximate cause of Plaintiffs' damages was the pilot's negligence. Proximate cause is a matter of foreseeability. *Control Techniques Inc. v. Johnson,* 762 N.E.2d 104, 108 (Ind.2002). It was foreseeable that flying into known icing conditions would result in icing and icing in turn could result in an air crash. Any negligence on the part of Flight Service Station personnel or Air Traffic Control personnel was not a proximate cause of Plaintiffs' damages. Flight controllers cannot be held liable for the pilot's unforeseen negligence in failing to take safety precautions. *Davis* at 556.

Therefore, the Court finds in favor of the United States and against the Plaintiffs. Judgment is entered accordingly.

**IT IS SO ORDERED.**