Sherrie **BIEBERLE**, Plaintiff,

v.

**UNITED STATES of America,
Defendant.**

**Richard Bieberle, Plaintiff,**

v.

**United States of America, Defendant.**

**Robert H. Souders, Jr., Plaintiff,**

v.

**United States of America, Defendant.**

**Robert H. Souders, Plaintiff,**

v.

**United States of America, Defendant.**

**Nos. 01–1060–WEB, 01–1061–
WEB, 01–1063–WEB.**

United States District Court,
D. Kansas.

Feb. 27, 2003.

N. Trip Shawver, Wichita, KS, for Plaintiff.

Emily B. Metzger, Office of United States Attorney, Wichita, KS, Robert G. David, Jr, U.S. Department of Justice, Tots Branch–Civil Division, Washington, DC, Steven A. Kirsch, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for Defendant.

## Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This litigation arises out of the crash of a small aircraft near Augusta, Kansas, on May 24, 1998. The plane, a twin-engine Cessna 310R, was piloted by plaintiff Robert H. Souders, Sr. Plaintiffs Richard Bieberle, Sherrie Bieberle, and Robert H. Souders, Jr., were passengers on the plane. Pilot Souders took off with his passengers at about 3:15 a.m. on the morning of May 24th from the Augusta (Kansas) Municipal Airport. Almost immediately the aircraft became enshrouded in fog, and Souders became disoriented. The plane struck some power lines and crashed in a field a short distance from the airport. All of the plaintiffs survived the crash, but they suffered various injuries. They subsequently filed this action against the United States under the Federal Tort Claims Act, claiming that employees of the Federal Aviation Administration(FAA) were negligent by failing to warn Souders about a report of fog at a nearby airport and by failing to monitor the flight and timely notify rescue authorities of the crash.

The above-listed cases were filed separately but have now been consolidated. The matter is before the court on the United States' motion for summary judgment. Pursuant to the court's order of April 17, 2002, the parties conducted additional discovery after the motion was filed; and they have now submitted supplemental briefs addressing the effect of the additional discovery. After examining the briefs, the court concludes that oral argument would not assist in deciding the issues presented.

## I. Facts.

The court finds the following facts are uncontroverted for purposes of summary judgment.

On May 24, 1998, plaintiff Robert H. Souders, Sr., (hereinafter "Souders") was the co-owner and pilot of a twin-engine, propeller-driven Cessna 310R airplane. The registration number of the plane was N5247J. Souders held a commercial pilot certificate with an instrumentrating.

Plaintiffs Robert H. Souders, Jr., Richard K. Bieberle, and Sherrie Bieberle were Souders' passengers in N5247J on May 24, 1998.

On the evening before the flight, May 23, 1998, at approximately 5:18 p.m., Souders contacted the FAA's Wichita Automated Flight Service Station (AFSS) to file an Instrument Flight Rules(IFR) flight plan from Augusta Municipal Airport in Augusta, Kansas, to Indianapolis, Indiana, as well as a return IFR flight plan.[1]

The call between Souders and the flight service briefer on May 23rd was recorded.

---

1. Instrument Flight Rules (IFR) are a set of rules governing the conduct of flight under instrument meteorological conditions. In IFR flights, the pilot may control the aircraft by reference to instruments. An IFR rated pilot may fly into weather conditions that prevent visual ground references. IFR certifi-

Def. Mem., Exh. 2. In the course of this conversation, Souders indicated that the purpose of his trip was to attend the Indianapolis 500. He advised the briefer that the time of his departure from Augusta would be 3:15 a.m. (Central Daylight Time)[2] on May 24, 1998. When the briefer remarked about Souders having to get up so early, Souders responded, "well I'm not real wild about it especially in view of the weather it looks kind of iffy."[3] Souders did not request any weather information during this briefing.

Early the next morning, on May 24, 1998, at approximately 2:15 a.m., Souders telephoned the Wichita AFSS to get a preflight weather briefing. A transcript of this call, which was recorded, is attached to Defendant's Memorandum, Exh. 3. Souders began his call by stating, "good-morning wonder if i could get a little weather information we have an ifr on request for three fifteen out of augusta...." Souders said his route would take him a little south of Kansas City, a little south of St. Louis, and into Indianapolis. The AFSS briefer, Carla Freeman, advised Souders about thunderstorms along his route in Illinois and Indiana, including a line of severe thunderstorms across central Illinois. Freeman also advised of a severe thunderstorm watch in Illinois and Missouri with possible hail of two inches in diameter. Freeman told Souders that rain showers and fog were forecast at Indianapolis from the present time until three hours and forty-five minutes after Souders' projected arrival time and that thunderstorms were forecast after that. Freeman advised Souders that there were no pilot weather reports available in the system at that time of the morning. At no time did Souders request, nor did Ms. Freeman provide, weather information about the Augusta Airport or other locations in the Sedgwick and Butler County areas. The weather briefing by Ms. Freeman began at 2:15 a.m. and ended at 2:21 a.m.

When Ms. Freeman first received pilot Souders' request for a weather briefing, she typed his flight plan into her computer. Based on that information, a computer program used by flight services known as "Model 1" generated an extensive weather report, including surface observations and forecasts, for flights along the Augusta–to–Indianapolis route. The report, which is attached as Exhibit 3 to defendant's supplemental memorandum, included automated weather observations for numerous airports, including three airports in Sedgwick County: Wichita Mid–Continent Airport (identified on the report by the code "KICT"), McConnell Air Force Base ("KIAB"), and Jabara Airport ("K3KM").[4]

cation ensures that pilots have the necessary skills to fly in cloud and other conditions where visual navigation and hazard detection is impossible. In IFR conditions, the pilot is dependent upon a radar controller for information as to the presence of other aircraft. By contrast, under VFR, or visual flight rules, a pilot relies upon the ability to visually see and avoid other aircraft. No person may operate an aircraft in controlled airspace under IFR unless that person has filed an IFR flight plan and has received an appropriate clearance from Air Traffic Control.

**2.** The references to time in the record are actually stated in Coordinated Universal Time("UTC" or "Zulu"), formerly known as Greenwich Mean Time. For the sake of convenience, all references to time in this opinion have been converted to Central Daylight Time.

**3.** The transcripts of the recorded conversations contain no punctuation or capital letters. The portions of the transcripts quoted herein are set forth exactly as they appear in the exhibits.

**4.** Defendant's Supplemental Memorandum states that due to a recent change in Jabara's airport identifier code, the United States incorrectly asserted in its reply brief that Ms. Freeman did not have any weather observation for Jabara Airport at the time she briefed

The report indicated that at 1:56 a.m. on May 24th, Mid–Continent Airport reported visibility of 5 statute miles and clear skies below 12,000 feet. It indicated that at 1:55 a.m., McConnell Air Force Base reported visibility of 7 statute miles with a few clouds at 25,000 feet. The report showed that at1:54 a.m., Jabara Airport reported visibility of 2½ statute miles, mist, surface wind 330 at 3 knots, and clear skies below 12,000 feet. The report contained an updated observation for Jabara Airport showing that at 2:02 a.m., Jabara reported visibility of 4 statute miles, mist, calm winds and clear skies below 12,000 feet. None of these local airports reported fog. See Def.Supp. Mem., Exh. 1.

As indicated, Ms. Freeman did not advise Souders of the conditions at any of the three Sedgwick County airports shown on the report. In her deposition, Freeman stated that she gave Souders an "abbreviated briefing" because in her experience when pilots on IFR flights request "a little weather," as Mr. Souders did, they want an abbreviated rather than a standard briefing. Ms. Freeman further stated that she did not provide Souders the information on the local airports because she looked at the data and saw it was VFR, meaning the conditions exceeded the minimum weather requirements for VFR flight, and she concluded it did not concern Souders, so she briefed him on the weather hazards that were reported or forecast at various other points along his route of flight. *Id.*

Under FAA regulations, in order for a pilot to operate under VFR at night below 10,000 feet, the visibility must be 3 statute miles or greater and pilots may not fly into clouds. 14 CFR § 91.155(a) (1998). Reg-

ulations prohibit a person from acting as pilot-in-command of an aircraft in weather conditions less than those prescribed for VFR flight unless that person holds an instrument rating on his pilot certificate. As previously noted, Mr. Souders is an instrument-rated pilot.

Augusta Airport is located approximately 17 miles east of the Wichita Mid–Continent Airport. Augusta Airport is known as a non-towered or uncontrolled airport because it does not have an FAA air traffic control (ATC) facility there.

As of May 24, 1998, the Augusta Airport did not have any human weather observer or automated device for reporting weather conditions to the FAA weather reporting system for dissemination to pilots and AFSS briefers. Pilot Souders was on notice of this fact through the publicly-available FAA publication known as the *Airport/Facility Directory*.

At 2:45 a.m. on May 24, 1998, Souders left his home at 8329 Overbrook in Wichita, Kansas 67206, to drive to the Augusta Airport. Two days after the accident, Souders admitted to FAA safety inspectors that he had "noticed fog on the way to the airport." Two days after the accident, plaintiff Sherrie Bieberle reported to aviation inspectors that on May 24th "on the way out to Augusta from Wichita, she and her husband encountered areas of ground fog." Less than twelve hours after the accident, plaintiffs Richard Bieberle and Robert H. Souders, Jr., reported to FAA safety inspectors that just prior to take off "visibility was partly obscured by patches of fog," although both men recalled being able to see stars in the night sky.

An automated 2:54 a.m. weather observation at Jabara Airport on May 24, 1998, recorded visibility of½ mile with fog and vertical visibility of 100 feet.[5] A 2:55 a.m.

Mr. Souders. The United States now concedes that Ms. Freeman had an observation for Jabara.

5. Although this 2:54 a.m. Jabara observation is not cited in the exhibits, the observation is described in a National Transportation Safety Board investigative narrative of the accident. Pl. Rep. Mem., Exh. 1.

observation at McConnell AFB reported visibility of 7 miles with a few clouds at 25,000 feet.

Pilots who intend to take off from uncontrolled airports such as Augusta Municipal on IFR flight plans are required to first contact the Wichita Mid–Continent Airport Traffic Control Tower(ATCT) for the purpose of receiving a "release" (approval) for takeoff. At 3:11 a.m.on May 24th, Souders contacted the Wichita ATCT by radio from his airplane at Augusta Airport in order to obtain his IFR clearance.

An ATC clearance means an authorization by ATC for an aircraft to proceed under specified conditions within controlled airspace. The purpose of ATC's providing clearances to pilots intending to fly on IFR flight plans is primarily for ATC to provide separation of that aircraft from other aircraft also being flown on IFR flight plans within the ATC system, in accordance with IFR procedures described in Federal Aviation Regulations (FAR's), 14 CFR part 91.

FAA Air Traffic Control Specialist Janice O'Bryan was the only controller on duty in the Wichita tower in the early morning hours of May 24th. At 3:11 a.m., Ms. O'Bryan provided Souders with a clearance to proceed direct to Indianapolis, and instructed him to maintain an altitude of 7000 feet, to "squawk" the code 1146 on his airplane's transponder,[6] and to "call for [a] release." A release, when granted, allows a pilot to depart an airport using his IFR clearance.

After Ms. O'Bryan instructed Souders to call for a release, the following conversation took place between Souders (N5247J) and O'Bryan (RT):

3:11:37 a.m. N5247J: (unintelligible) maintain seven thousand (unintelligible) release maam

3:11:46 RT [Radar Tower]: twin cessna four seven juliet readback correct and uh just give me a call on [frequency] one three four point eight i think you can reach me there

3:11:54 N5247J: (unintelligible)

3:11:59 RT: yeah your radio is breaking up on this frequency twin cessna four seven juliet

3:12:04 N5247J: (unintelligible)

3:12:13 RT: okay its still breaking up pretty bad uh twin cessna four seven juliet uh are you going to be ready to go shortly

3:12:18 N5247J: yes maam (unintelligible)

3:12:20 RT: twin cessna four seven juliet roger you're released just report airborne

3:12:25 N5247J: (unintelligible)

When a release is given by a controller for takeoff from an uncontrolled airport like Augusta Airport, the pilot is directed to notify the controller when the aircraft becomes airborne. This is due to the controller's uncertainty as to when the pilot will actually initiate the takeoff. When the pilot reports being airborne, the controller may then, or shortly thereafter, scan the radar screen to confirm the location and altitude of the aircraft for the purpose of radar—identifying it and providing separation of that aircraft from other IFR aircraft being flown on IFR flight plans.

A "clearance void time" is a time specified by an air traffic controller at which a clearance ceases to be valid unless the aircraft has already taken action to comply therewith. (In other words, it is an expi-

---

**6.** A transponder is a receiver and transmitter that receives radio signals from ATC radar stations and responds to them. The code entered by the pilot in the transponder allows ATC to discretely identify the aircraft on radar.

ration time.) Clearance void times are only issued when necessary to separate departures from other traffic or to restrict or regulate departure flow. Ms. O'Bryan did not issue N5247J a clearance void time.

Other IFR traffic for the airport where a clearance is issued is suspended until the aircraft has contacted ATC or until 30 minutes after the clearance void time or 30 minutes after the clearance release time if no clearance void time is issued.

N5247J was not required to depart Augusta at any particular time after receiving the release because the pilot was not issued a clearance void time. With no other traffic scheduled to arrive or depart Augusta at or around 3:12 a.m., a release without a clearance void time allowed Mr.Souders to take his time and to depart at his convenience without his clearance expiring due to the passage of time.

Pilot Souders took off southbound from the Augusta airport at approximately 3:15 a.m.

Sounders never reported to the Wichita ATCT controller that he was airborne. Seconds after lift off, he encountered fog and immediately became confused and disoriented. Shortly after lift-off, he felt the airplane shudder and saw a blinding flash.

Passenger Robert H. Souders, Jr., later said that he felt a positive climb followed by an immediate level off. He had flown with his father on many occasions and had never seen him level the aircraft so soon after takeoff. He was about to ask his father what he was doing when the plane impacted some power lines. Plaintiff Richard Bieberle reported to authorities that "he never felt like they were climbing. In fact, [it] felt like they were descending." Both of these passengers agreed that they weren't airborne for more than thirty seconds before the plane impacted the ground.

At 3:15 a.m., the airplane struck some power lines located south-southwest of a field that was slightly below the Augusta Airport field elevation. The plane continued for another three-quarters of a mile before impacting terrain and sliding 900 feet into some trees. The plane caught fire and each of the plaintiffs suffered various injuries. Robert Souders, Jr., and Richard Bieberle suffered burns while rescuing Sharon Bieberle from the aircraft.

About 22 minutes later, at 3:37 a.m., the Butler County (Kansas) Sheriff's Department received a 911 call from an individual at 13075 S.W. 120th Street who advised that a man was in his yard yelling for help, that the power was out in the area, and that a plane was down with four occupants injured. At 3:38 a.m., the Sheriff's Department dispatcher notified Deputies J. Train and Glenn Hopper of the report.

At 3:40 a.m., the deputies were flagged down by a motorist carrying plaintiff Richard Bieberle to the hospital. Bieberle informed Deputy Train about the accident and its general location.

Deputy Train summoned an ambulance to pick up Bieberle and left to go locate pilot Souders and the other passengers.

Deputy Train and other rescue personnel then located the crash site and assisted EMS crews and fire personnel in accessing the area so that they could treat pilot Souders, Robert H. Souders, Jr., and Sherrie Bieberle, and then transport them to the hospital.

At the crash site, pilot Souders advised Sgt. L.K. Dod son of the Butler County Sheriff's Department that the plane was "no higher than 100 feet [above ground level] when it went down."

The elevation of the Augusta Airport is 1328 feet above mean sea level. The airport is 17 miles east of the Terminal Radar Approach Control (TRACON) radar anten-

na, which is located at the Wichita Mid–Continent Airport on the west side of Wichita. Due to this 17 mile distance and the terrain features, the radar antenna at Wichita Mid–Continent Airport is unable to detect aircraft at the Augusta Airport lower than an altitude of about 1600 feet above mean sea level (i.e., approximately 272 feet above ground level).

In her deposition, Ms. O'Bryan testified that ordinarily when she released an aircraft from the Augusta Airport she would watch her radar screen until the aircraft got high enough to establish radar contact. She would then inform the pilot of radar contact and issue whatever instructions were necessary. Ms. O'Bryan testified that after she released N5247J she never saw a radar target on her screen in the area of the Augusta Airport. She testified that if the aircraft had reached high enough to establish radar contact and had then descended below radar contact, the aircraft's call sign would have moved to a "suspense list" on her radar scope, but she said this did not happen.

The tracking system with the radar in use at the Wichita ATCT on May 24, 1998, did not have the capability of recording the radar data presented on the air traffic controller's radar scope; therefore there is no recorded radar data available from the Wichita ATCT concerning this accident.

The available evidence indicates that a radar target for N5247J did not appear on the air traffic controller's radar scope in the tower cab at the Wichita ATCT because N5247J did not climb high enough to be detected by the TRACON radar antenna.[7]

Ms. O'Bryan testified that when N5247J did not report airborne and she saw no indication on radar that the aircraft had taken off, she assumed that the pilot may have delayed his takeoff. She did not attempt to contact N5247J by radio, however, until 4:18 a.m., over an hour after there lease.[8] At 4:18 a.m., Ms. O'Bryan saw a radar target appear on her screen in the area of the Augusta Airport. She thought that the aircraft might be N5247J, so she attempted to contact it by calling, "twin cessna four seven juliet wichita approach." She received no response, and correctly concluded that the target was another aircraft that was expected in the pattern.

To ensure that a flight plan will remain active, pilots are required to notify Air Traffic Control if their actual departure time will be delayed one hour or more beyond their filed proposed departure time.

At 6:00 a.m., Ms. O'Bryan received a radio transmission from a person at the

---

7. Plaintiffs' initial brief denied this assertion on the grounds that "until the deposition of the air traffic controller is taken we do not know whether she was looking at the screen and saw the plane come into view ... or the transponder come on the screen and then disappear...." Doc.30 at Pp. 3, 13. Plaintiff's supplemental memorandum, which was filed after the deposition was taken, does not address the issue. The court notes, however, that plaintiffs have cited no evidence that N5247J reached a sufficient altitude to be detected by the TRACON radar. As such, any suggestion that the aircraft may have appeared on the controller's radar is based on speculation and surmise.

8. Ms. O'Bryan also testified that approximately 45 minutes to an hour after the release she attempted to call the Augusta Airport via phone line to determine the status of N5247J, but she received no answer. Def. Supp. Mem. Exh. 6 at 72, 79. As the plaintiffs point out, there is no record of this telephone call, and the veracity of the allegation thus depends on an assessment of Ms. O'Bryan's credibility. In light of the standards governing summary judgment, the court will assume for purposes of the motion that Ms. O'Bryan's first attempt to ascertain the status of N5247J was her 4:18 a.m. recorded radio transmission.

FAA's Kansas City Center watch desk informing her that N5247J had crashed on takeoff.

In her deposition, Ms. O'Bryan testified that before she was notified of the crash, she assumed N5247J had not taken off and did not think it had crashed because, among other factors, there was never any radar contact with the plane, she had received no verbal communication, there was never any "Mayday" call, and there was no "ELT" (Electronic Locator Transmitter) signal indicating a crash.

In the afternoon or evening of May 24, 1998, Ms. O'Bryan was given a post-accident drug test in accordance with Department of Transportation procedures. She tested positive for cannabinoids, which are a urinary metabolite of THC, the psychoactive drug in marijuana. It cannot be determined from this test whether Ms. O'Bryan was under the influence or impaired by marijuana during the performance of her duties on May 24th. The test does not indicate whether any quantity of THC was present at the time the urine sample was collected. The presence of cannabinoid metabolites does not establish when or in what quantity the psychoactive parent drug, THC, was present in the body. The peak concentration of THC in blood serum typically occurs 7 to 15 minutes after smoking marijuana, and the corresponding effects thereafter decline rapidly and last for several hours at most. The acute psychoactive effects of THC, including any impairment caused, do not survive more than 24 hours after last marijuana use, but inactive THC metabolites can be present and are detectable in urine for days or weeks or even months under some conditions.

Pilot Souders states in an affidavit that had he been made aware of the fact that Jabara Airport had ½ mile visibility with fog and a 100 foot ceiling because of fog, he "would have been more aware of the potential for more than just patchy fog and would have utilized an instrument takeoff while leaving the airport at 3:12 a.m. on May 24, 1998." Souders was surprised when he was engulfed in the fog immediately after takeoff. Pl. Rep. Mem., Exh. 7.

## II. Standards Governing Summary Judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ. P.56(c). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Thus, Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any *material* fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548 (1986).

Under Rule 56, the moving party (here the United States) initially bears the burden of making a *prima facie* showing of the absence of a genuine issue of material fact and an entitlement to judgment as a matter of law. See *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). This burden may be satisfied by pointing to an absence of evidence on an essential element of the plaintiff's claim.

*Id.* at 671 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). Once the moving party carries this burden, the opposing party cannot simply rest upon the pleadings; it must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In applying this standard, the court views the factual record and draws all reasonable inferences therefrom in the light most favorable to the non-moving party. See *Curtis v. Oklahoma City Public Sch. Bd. of Ed.,* 147 F.3d 1200, 1214 (10th Cir.1998).

### III. Summary of Arguments.

The United States seeks summary judgment on several grounds. It contends that its FAA employees had no duty to inform pilot Souders of the conditions at Jabara Airport and further argues that a failure to provide such information cannot be considered a cause of the crash because Souders knew there was fog in the Augusta area when he took off. The United States also contends that Souders' negligence in failing to properly climb after takeoff was a superseding cause of the crash that renders moot any claim of negligence against the FAA employees. As for plaintiffs' claim that the air traffic controller failed to properly monitor the flight and notify rescue authorities, the United States argues that the soonest point at which the controller had any duty to initiate rescue procedures was 30 minutes after the aircraft was released. Because rescue authorities had already been notified by that time, the United States argues that the controller's failure to act cannot be considered a proximate cause of plaintiffs' injuries.

In response, plaintiffs argue that the FAA employees had a duty to provide current weather conditions to Souders and to warn him of any hazardous weather, including low visibility, that could affect his flight. Plaintiffs contend that although Souders knew there was fog in the area, he did not think the fog was that bad, and he would have performed an instrument takeoff had he known of the extent of the fog at Jabara Airport. Plaintiffs argue that under the Kansas laws of comparative negligence, the extent to which each party's negligence may have contributed to the accident is a question of fact that cannot be resolved on summary judgment. As for the air traffic controller's failure to monitor the flight, plaintiffs argue that a reasonable controller "would have inquired within minutes" after Souders did not report airborne and the aircraft did not appear on the radar screen, and they say that if Ms. O'Bryan had called authorities within five minutes of the release they would have received help sooner and would have been spared some of their pain and suffering. Plaintiffs argue "it is a question of fact as to whether the responsible and timely actions of the Air Traffic Controller would and could have alerted authorities earlier." Pl. Supp. Mem. at 8. Plaintiffs' supplemental memorandum offers additional arguments against summary judgment, including new allegations that the air traffic controller was negligent by controlling the flight while under the influence of drugs, by failing to provide an altimeter setting to Souders when she issued the release, by failing to use approved language in issuing the release, and by failing to prepare a flight progress strip after releasing the aircraft.

### IV. Discussion.

 The Federal Tort Claims Act provides for federal jurisdiction of claims against the United States based on the negligence of employees of the United States acting within the scope of employment "under circumstances where the United States, if a private person, would

be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). See also 28 U.S.C. § 2674 (the "United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...."). Because the alleged acts of negligence in this case occurred in Kansas, plaintiffs' claims against the United States are governed by Kansas law. In Kansas, a plaintiff seeking to recover for negligence must prove: (1) the existence of a duty (2) a breach of that duty(3) injury, and (4) a causal connection between the duty breached and the injury suffered. *Hall v. Kansas Farm Bureau*, 50 P.3d 495, 506 (Kan.2002). Whether a duty exists is a question of law. *Id.* (citing *Nero v. Kansas State University*, 253 Kan. 567, Syl. ¶ 1, 861 P.2d 768 (1993)).

■ Air traffic controllers and flight service specialists owe pilots and passengers a duty of reasonable care. See e.g. *Yates v. United States*, 497 F.2d 878, 883 (10th Cir.1974); *Webb v.United States*, 840 F.Supp. 1484, 1511 (D.Utah 1994) (FSS specialists and controllers, along with the pilot, have concurrent duty of care for the protection of the aircraft and its occupants). What that duty entails in a given situation may depend on various sources, including FAA orders, federal regulations, and norms and customs of the air traffic control system. Relevant sources include the Air Traffic Control Manual (FAA Order 7110.65), the Flight Services Manual (FAA Order 7110.10), and the Aeronautical Information Manual. See *Tinkler v. United States*, 982 F.2d 1456 (10th Cir.1992) (duty to provide weather arose from both the dictates of the Flight Services Manual as well as the reliance pilots place on FSS briefers); *Gill v. United States*, 429 F.2d 1072, 1075 (5th Cir.1970) (the government's duty to provide services with due care to airplane pilots may rest upon the requirements of manuals spelling out the

functions of air traffic controllers). An air traffic controller is required to give all information and warnings specified in these manuals, and in certain situations must give warnings beyond the manuals, such as when the danger is immediate or extreme, or when the controller is better qualified than the pilot to evaluate a given situation. *Davis v. United States*, 824 F.2d 549, 550 (7th Cir.1987). This duty to warn is based on the simple tort principle that once the Government has assumed a function or service, it is liable for any harm caused by negligent performance of that function. *Id.* at 550–51.

■ A. Acts or Omissions of AFSS Carla Freeman. Turning now to the specifics of plaintiffs' claims, plaintiffs first argue that under the Flight Services Manual (FAA Order 7110.10), Flight Services Specialist Carla Freeman had a duty to provide pilot Souders with a "standard" rather than an "abbreviated" pre-flight weather briefing, and they argue that her failure to do so "may have impaired the pilot's ability to appreciate and understand the conditions." Pl. Supp. Mem. at 7.

FAA Order 7110.10 sets forth the procedures to be used by air traffic personnel providing flight services, including weather briefings, to pilots. Paragraph 3–1–7 describes three different types of briefings: standard, abbreviated, and outlook; and it directs briefers to provide the particular type requested. If it is not clear which type the pilot wants, the briefer is to provide the first one or two items requested and then as certain if the pilot would like a standard briefing. A standard briefing includes a more extensive summary of weather-related items than an abbreviated briefing, including a summary of current conditions and forecasts that apply to the proposed flight. By contrast, an abbreviated briefing is more tailored toward specific information requested by the pilot.

Under either type, the briefer is directed to include adverse reported or forecast weather conditions applicable to the proposed flight that might influence the pilot to alter the flight.

Although Ms. Freeman took pilot Souders' request for "a little weather" as an indication that he wanted an abbreviated briefing, his request was at least ambiguous on that point, and thus under ¶ 3–1–7 Ms. Freeman probably should have inquired further to clarify what type of briefing Mr. Souders wanted. Nevertheless, any such failure cannot reasonably be considered a cause of the crash. At the time Ms. Freeman gave her briefing, the observations at the three Sedgwick County airports all showed VFR conditions with no reports of fog. Assuming for the moment that a standard briefing would have included a summary of these conditions, plaintiffs cite no evidence that such a report would have influenced or affected Mr. Souders' operation of the aircraft. Nor can such an argument reasonably be constructed from the record. The failure thus had nothing to do with the crash of N5247J. As for the 2:54 a.m. observation of fog at Jabara Airport, Ms. Freeman did not have that report available at the time of her briefing (2:21 a.m.), and she obviously had no duty to provide information that was not available. As such, the defendant is entitled to judgment as a matter of law on the claim that Ms. Freeman was negligent by failing to give a standard briefing.

**B. Acts or Omissions of Air Traffic Controller Janice O'Bryan.**

■ 1. Use of Marijuana. Plaintiffs next claim that Air Traffic Controller Janice O'Bryan was negligent "in that she was controlling the Plaintiffs' aircraft while under the influence of drugs." Pl. Supp. Mem. at 3.

The parties disagree whether the record contains sufficient evidence for a finder of fact to reasonably conclude that Ms. O'Bryan was impaired by marijuana in the performance of her duties. In support of their argument, plaintiffs cite the fact that Ms. O'Bryan tested positive for the use of marijuana, she made certain corrections to a written statement given after the accident, and she invoked the Fifth Amendment at her deposition when asked about use of marijuana. These factors, however, are of limited significance, whether considered singly or together. Given there latively brief period in which THC remains in the system after use of marijuana and the much longer period thereafter in which THC metabolites can be detected, the fact that Ms. O'Bryan tested positive for THC metabolites on May 24th does not establish any probability that she was impaired on that date. It merely indicates that she used marijuana at some point in the recent past. Likewise, Ms. O'Bryan's invocation of the Fifth Amendment at her deposition (during which she also denied using marijuana on the 23rd or the 24th) does not reasonably infer that she was impaired at the time of the accident. It would be pure speculation to assume from this evidence that Ms. O'Bryan was impaired by drugs in the performance of her duties.

■ Even assuming plaintiffs could show that Ms. O'Bryan was impaired, this fact alone would not establish a viable claim of negligence (or negligence per se), because the fact of impairment, standing alone, was not a cause of the crash or the injuries. To establish a causal connection, plaintiffs must cite evidence that Ms. O'Bryan unreasonably did or failed to do something relating to their flight that caused or contributed to the crash or the injuries. See *Schwartz v. Brotherhood of Maintenance of Way Employees,* 264 F.3d 1181, 1183 (10th Cir.2001)(the mere existence of some factual dispute will not defeat an otherwise properly supported mo-

tion for summary judgment because the factual dispute must be material). As the court will discuss in the following sections, to the extent Ms. O'Bryan may have unreasonably acted or failed to act, such failures were not a proximate cause of the crash or the plaintiffs' injuries.

■ 2. Failure to issue altimeter setting. Plaintiffs next argue that Ms. O'Bryan was negligent by failing to issue an altimeter setting for plaintiffs' aircraft. This claim is based on ¶ 2–7–2 of the Air Traffic Control Manual, which directs controllers to issue an altimeter setting (with certain exceptions) "to all departures." Ms. O'Bryan did not issue an altimeter setting to Mr.Souders.

This claim fails for two reasons. First, there is no evidence to contradict the declaration of defendant's air traffic control expert, Anacletus C. Queri, who states that controllers are taught to apply ¶ 2–7–2 by issuing the altimeter setting to departing IFR aircraft from uncontrolled satellite airports *after* the aircraft has taken off. Queri explained that controllers do not know for certain when such aircraft will take off, and that changes in the weather could affect the altimeter setting if takeoff is delayed. Accordingly, the setting is issued after the aircraft is airborne. See Def. Supp. Mem., Exh. 7 at 2. The court sees nothing in the record to suggest that such a practice constitutes a breach of the duty of reasonable care. The second reason this claims fails is because there is no evidence that Ms. O'Bryan's failure to provide an altimeter setting was a contributing factor in the crash. No claim is made that Mr. Souders' altimeter setting was erroneous due to the controller's failure to provide a setting or that such an erroneous setting contributed to the accident.

■ Failure of the Controller to provide current weather information. Plaintiffs next allege that Ms.O'Bryan was negligent by failing to inform Mr. Souders that fog

and visibility of ½ mile, with vertical visibility of 100 feet, were reported at Jabara Airport at 2:54 a.m. Plaintiffs argue that under the Air Traffic Control Manual, ¶ 2–6–1 through 2–6–4, Ms. O'Bryan had a duty to provide such information. Pl. Supp. Br. at 5.

As a preliminary matter, the United States argues there is no evidence that the 2:54 a.m. Jabara observation was available to Ms. O'Bryan when Souders contacted her. When Ms. O'Bryan was asked at her deposition whether this report had been available to her, she said she could not recall. Although plaintiffs' brief does not adequately address this point (plaintiffs simply assert, without proper support, that the observation would have been available, see Pl. Supp. Br. at 5), the court believes the circumstantial evidence in the record, viewed in the light most favorable to plaintiffs, could be sufficient to support an inference that this type of automated weather observation would have been available to Ms. O'Bryan by computer when she spoke to Mr. Souders.

Plaintiffs argue specifically that under ¶ 2–6–2 of the ATC Manual, Ms. O'Bryan had a duty to warn Souders of any hazardous weather within a 150 mile radius, including the Jabara observation of fog and reduced visibility. The court cannot conclude from the language of this paragraph that the controller had such a duty. Paragraph 2–6–2 is entitled "Hazardous In flight Weather Advisory Service" ("HIWAS"), which is defined in the FAA Pilot/Controller Glossary as "continuous recorded hazardous in flight weather forecasts broadcasted to airborne pilots over selected VOR outlets defined as [a] HI WAS BROADCAST AREA." Def. Rep. Mem., Exh. 1 at 9. Although ¶ 2–6–2 contains a 150 mile rule (subject to certain exceptions), the context of the requirement indicates that it deals with ad-

visories to airborne pilots. Absent some evidence that the air traffic controllers must apply this paragraph to aircraft on the ground, the court cannot find that it obligated Ms. O'Bryan to issue a hazardous weather advisory to N5247J before its departure. Plaintiffs also argue that Ms. O'Bryan had a duty to inform Souders of the Jabara conditions by virtue of ¶ 2–6–4, which directs air traffic controllers to "[i]ssue pertinent information on observed/reported weather...." Pl. Mem. Exh. 6. Plaintiffs rely on Mr. Souders' affidavit—in which he states that had he known of the Jabara observation he would have altered his method of takeoff—as evidence of the significance of the Jabara weather.[9]

This subjective view of what was "pertinent," however, does not establish that the controller's actions failed to comply with the requirements of the ATC Manual. Jabara is located 9 miles northwest of Augusta Airport. Plaintiffs' flight plan, which was known to Ms. O'Bryan, called for N5247J to depart Augusta heading east toward Indianapolis, meaning the aircraft would set out away from Jabara and would not fly over that location. Ms. O'Bryan testified that the Manual did not require her to relay the Jabara observation because Mr. Souders would not be landing or performing operations there. Mr. Queri, the defendant's air traffic control expert, similarly states that nothing in the Manual required Ms. O'Bryan to provide the weather at Jabara because it "was not pertinent to [Souders'] flight" in view of his intended route away from Jabara. Def. Supp. Mem., Exh. 7 at 3. Plaintiffs cite no evidence that a reasonable air traffic controller in this position would consider the Jabara conditions to be pertinent to

the flight of N5247J. Absent such evidence, the court concludes that plaintiffs have failed to establish an essential element of their claim, and the United States is therefore entitled to judgment on the claim as a matter of law.

■■■■ Even if the controller's failure to provide the Jabara conditions were considered a breach of duty, the court cannot see how such a failure could be regarded as a proximate cause of the crash. Proximate cause is that cause which, in a natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. *St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043 (1989) The uncontroverted facts show that Mr. Souders was aware of fog in the Augusta area when he performed his takeoff. He saw fog on the way to the airport and his passengers reported that just before takeoff visibility was partly obscured by patches of fog. Given this knowledge, the controller's failure to report fog at the Jabara Airport cannot reasonably be said to have caused the crash, even if the report would have indicated to Mr. Souders that the fog at Jabara was heavy. This is not a case of an air traffic controller having superior knowledge of the weather conditions under which the aircraft was operating. The controller had no information at all on the Augusta conditions. Mr. Souders, on the other hand, was at Augusta and saw patchy fog in the area. He was unquestionably on notice of the fact that visibility in the area was variable and could be obscured in the climb after takeoff. This potential for obscured vision should

---

**9.** Plaintiffs also allege that under the Wichita ATCT operating procedures, "the weather utilized for evaluating IFR activity for the Augusta Airport (3AU) is Jabara (IAB)." Pl. Supp. Mem. at 5. As the Government points out, IAB is the identifier for McConnell Air Force Base, not Jabara. See Def. Supp. Mem., Exh. 7.

have alerted Mr. Souders to the fact that reliance upon his instruments might be necessary to safely perform the takeoff. Despite this, Mr. Souders was apparently not ready to rely upon his instruments when he encountered fog, even though he was instrument rated and was qualified to do so. Mr. Souders essentially concedes he was cognizant of the potential for obscured vision when he says that if he had known of the Jabara conditions he "would have been *more aware* of the potential for more than patchy fog. . . ." Pl. Rep. Mem., Exh. 7 (emphasis added). It is true that the pilot and the air traffic controller each owe a duty of care to passengers in an airplane, and negligence by the pilot does not, in and of itself, absolve the government of liability. *Redhead v. United States*, 686 F.2d 178, 182(3rd Cir.1982). But given Mr. Souders' knowledge of fog in the area of takeoff, the controller's failure to relay an observation of fog at another location nine miles away which was not on the route of flight cannot reasonably be considered a proximate cause of this crash. Cf. *Davis v. United States*, 824 F.2d 549, 554 (7th Cir.1987) (briefer's alleged failure to provide weather warning was not a cause of the crash in light of pilot's negligence after pilot saw conditions that should have triggered precautionary responses); *Redhead v. United States*, 686 F.2d 178, 183 (3rd Cir.1982) (the controller was in no better position to inform the pilot about the weather than the pilot was himself); *Spaulding v. United States*, 455 F.2d 222, 226–27 (9th Cir.1972) (a controller's duty to warn does not relieve the pilot of his primary duty and responsibility for the safety of the aircraft and passengers; a pilot cannot disregard the weather conditions he sees around him); *Biles v. United States*, 848 F.2d 661, 663(5th Cir.1988)(if the controller was unaware of the exact weather conditions fifteen or more miles away, she could have no obligation to warn); *Black v. United States*, 441 F.2d

741, 745 (5th Cir.1971) (failure of the operator to warn the pilot of a storm in his path cannot be regarded as a continuing proximate cause after the pilot himself discovered its presence, appreciated the danger, and decided to fly into it). In sum, the court sees no genuine issue for trial on plaintiffs' claim of negligent failure to provide weather information.

Failure of the Controller to properly monitor the flight and failure to recognize the plight of the plane or take steps to ascertain its whereabouts. Plaintiffs next argue that Ms. O'Bryan was negligent by waiting for an extended period before attempting to contact N5247J or to discover its whereabouts after she released the aircraft. They contend it is a question of fact whether a reasonable person in Ms. O'Bryan's position would have been looking for the aircraft and would have alerted authorities sooner. Pl. Supp. Mem. at 7–9. Plaintiffs argue they may be entitled to damages under a "value of a chance" theory for the suffering they endured while awaiting rescue. *Id.* at 9. Also as part of this claim, plaintiffs allege that Ms. O'Bryan was negligent because she "failed to use the required language as set forth in the Standard Operating Procedure Manual," she "did not use any of the approved language for IFR departures from a satellite airport," and she did not put a flight progress strip at the appropriate radar position after releasing N5247J. Pl. Supp. Mem. at 7–8.

■ With regard to plaintiffs' assertion that Ms. O'Bryan did not use approved language when releasing the flight, plaintiffs have not specified what language they are referring to or how this failure caused their injuries. This makes it difficult to evaluate the claim. They may be referring to ¶ 2–13(i)(1) of the Wichita ATCT Handbook, which directs controllers to use specific language for IFR satellite airport

departures, including the issuance of an instruction to "HOLD FOR RELEASE, ADVISE ON FREQUENCY 134.8 WHEN READY FOR DEPARTURE." Pl. Supp. Mem., Exh. 10. Ms. O'Bryan did not use this precise language. To the extent plaintiffs are arguing that this failure prevented Ms. O'Bryan from realizing that Mr. Souders was ready for departure when she released the aircraft, the court rejects this suggestion. The transcript indicates that Ms. O'Bryan was aware of this fact. She specifically asked Mr. Souders if he were "going to be ready to go shortly," to which he replied, "yes maam." She thus was on notice that he was prepared for departure. For reasons the court will discuss in a moment, however, this does not present a material issue of fact for trial. Paragraph 10–3–1 of the ATC Manual is entitled "Overdue Aircraft." It directs controllers, in part, as follows:

> a. Consider an aircraft to be overdue, initiate the procedures stated in this section and issue an ALNOT [Alert Notice] when neither communications nor radar contact can be established and 30 minutes have passed since:
>
> [Note omitted]
>
> Its ETA over a specified or compulsory reporting point or at a clearance limit in your area.
>
> Its clearance void time.
>
> b. If you have reason to believe that an aircraft is overdue prior to 30 minutes, take the appropriate action immediately.

Paragraph 10–3–1 is followed by various procedures to be followed in the event of an overdue aircraft, including the initiation of emergency search and rescue operations.

Any question as to whether Ms. O'Bryan should have initiated overdue aircraft procedures pursuant to ¶ 10–3–1(a) once thirty minutes had passed after the release does not present a material issue for trial. This is because local authorities had already been notified of the crash and were rescuing the plaintiffs prior to the expiration of that thirty-minute period. Def. Mem., Exh. 13. Thus, the controller's failure to act after thirty minutes cannot be considered a cause of plaintiffs' injuries.

■ With respect to ¶ 10–3–1(b), and whether Ms. O'Bryan had a duty to take some action prior to the expiration of thirty minutes, the answer appears to the court to be a qualified yes. Contrary to plaintiffs' suggestion, however, nothing in the ATC Manual states that a controller in these circumstances has a duty to initiate search and rescue procedures if the controller does not promptly hear from the pilot or detect the aircraft on radar after the release is issued. Ms. O'Bryan's uncontroverted testimony was that there are a number of reasons why an aircraft might delay its departure after a clearance has been issued. These include the possibility that someone forgot a piece of luggage, the aircraft might need fuel, or there might be a mechanical problem. Mr. Queri also testified that in these circumstances "pilots at times will accept a clearance and for their own reasons choose not to depart and forget to call air traffic control and advise that they will not be using their clearance." Def. Mem., Exh. 11 at 3. In light of factors such as these, as well as the fact that N5247J never appeared on radar, never reported airborne, and never communicated any distress signal, it cannot be said that Ms. O'Bryan had a duty to presume that the aircraft was missing prior to thirty minutes, and it would have been inappropriate for her to initiate emergency search and rescue procedures merely by virtue of the fact she had not promptly seen or heard from the aircraft after it was released. Nothing in the ATC Manual imposes such a duty Rather, Mr. Queri states that in such a situation "[w]ithin a reasonable period of time, it is normal for

a controller to attempt to telephone the airport of departure to see if the airplane intends to depart or has been parked by the pilot." Plaintiffs cite the affidavit of an experienced pilot, David L. Dewhirst, who similarly states that "where a clearance void timeis not issued it would be unusual for the Wichita Air Traffic Control staff to let a plane go for more than five minutes from the release time without attempting to contact the pilot in some manner." Pl. Rep. Mem., Exh. 13. Based on this evidence, the court concludes that the duty of reasonable care in these circumstances may require a controller to attempt to determine the status of the flight by contacting the pilot or the airport of departure within a reasonable period of time after the release. The court further concludes there is a genuine issue of fact as to whether Ms. O'Bryan breached that duty by waiting forty-five minutes to an hour before attempting to do these things. Nevertheless, this finding does not preclude summary judgment because plaintiffs have cited no evidence of a causal connection between the controller's failure and their injuries. Specifically, they cite no evidence that if Ms. O'Bryan had attempted to contact the Augusta Airport (or N5247J) as she should have done, she likely would have been able to discover that the aircraft had already taken off. Absent some evidence to that effect, it cannot be said that Ms. O'Bryan's failure was a cause of any of the injuries. For example, plaintiffs might have met their burden by showing that someone was available at the Augusta Airport that morning who could have informed Ms. O'Bryan that the aircraft had departed. On the other hand, if no one was available, it cannot be said that a timely call would have put Ms. O'Bryan on notice that the aircraft had departed. There is nothing to suggest that a reasonable controller in these circumstances would have initiated search and rescue procedures. Under the circumstances, it cannot be said that Ms. O'Bryan's failure to attempt to determine the status of the flight—even though it was unreasonable— was a cause of any injury.

The court rejects plaintiffs' attempt to rely on the "theory of a chance" doctrine as a substitute for evidence that the controller's failure to inquire about the aircraft caused their rescue to be delayed. Kansas courts have applied the "theory of a chance" doctrine in medical malpractice cases where a physician's failure to accurately diagnose a condition has prevented a patient from obtaining appropriate medical treatment, with the consequence that the patient has lost the opportunity of getting better. See *Pipe v. Hamilton*, 56 P.3d 823, 826 (Kan.2002). The doctrine recognizes that this lost opportunity has a value, even though it may be doubtful whether appropriate treatment would have been successful. *Id.* Kansas courts have never applied the "theory of a chance" doctrine to the situation at issue here. This is a question of whether there is any evidence that the rescue would have been accomplished sooner if the controller called the Augusta Airport within a reasonable time after the release. To avoid summary judgment on this basis, plaintiffs must cite some evidence that an appropriate inquiry probably would have indicated a need for emergency assistance prior to the time the authorities actually learned of the accident. Without such evidence, any contention that the controller caused the plaintiffs' injuries fails as a matter of law. See *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988) (plaintiff cannot rest on speculation or suspicion and may not escape summary judgment in the mere hope that something will turn up at trial).

V. Conclusion.

The record shows there is no genuine issue of material fact and the defendant is

entitled to judgment as a matter of law. Accordingly, the United States motion for summary judgment (Doc.20) is hereby GRANTED. The clerk is directed to enter a judgment of dismissal in favor of the defendant United States of America and against plaintiffs Sherrie Bieberle, Richard Bieberle, Robert H. Souders, Jr., and Robert H. Souders.

IT IS SO ORDERED this day of February, 2003, at Wichita, Kansas.